SANTA'S WORKSHOP, INC., Appellant-Respondent, *v.* JOSEPH STERLING, Doing Business as STERLING ALASKA FUR & GAME FARMS, Respondent-Appellant.

Third Department, July 25, 1956.

*F. Walter Bliss, Warner M. Bouck* and *Harold R. Soden* for appellant-respondent.

*Lewis C. Ryan, Charles Gold, Benjamin Shove* and *Mortimer J. Metchik* for respondent-appellant.

BERGAN, J. Plaintiff since July, 1949 has maintained a public entertainment and sales facility on Whiteface Mountain known as "Santa's Workshop". Its location is called by plaintiff "North Pole" and a post office has been established using that name.

The facility consists of a group of specially designed buildings, painted in brilliant colors and with high-gabled roofs, centering around Santa, his home, his workshop, St. Nick's chapel, and his "friendly animals". The enterprise was very extensively advertised beginning in 1949; it obtained additional broad publicity in many media, and from the outset was highly successful.

The defendant for many years had operated fur farms in the Adirondack region. The animals were placed on public display and were advertised from time to time as "Nature's Magnificent Killers". He has two places of business, one at Ausable Chasm on Route 9 which travelers coming from the north would usually pass in going to plaintiff's facility; and one at Lake Placid on Route 86, which would be passed by travelers coming from the west to Whiteface Mountain.

There was nothing in the business enterprise of the defendant as he conducted it until 1950 which would have any rational association with Santa or St. Nick. He had no Santa on the premises and it may not easily be seen what place such a symbol would occupy in his game animal exhibit. But immediately after the successful inception of plaintiff's business in 1949, defendant changed his advertising. In 1950 he advertised in the *Adirondack Guide* that he had "Santa's Friendly Animals".

He did not continue this term after that year, but thereafter used "St. Nick's Animals". Over the entranceways of defendant's two establishments are large cutouts of Santa Claus and a white deer; and in the Ausable Chasm establishment there is a large billboard of Santa Claus seated in a sleigh with the legend "Here are 500 St. Nick's Game and Fur Animals".

It should be noted, also, that after 1950 when defendant adopted the Santa Claus advertising appeal, the customers who were induced thereby to patronize the defendant found no one impersonating Santa Claus or St. Nick on the defendant's grounds after they had paid their admission fees.

The cutouts used by defendant bear marked resemblance to plaintiff's Santa advertising and there are numerous advertising practices of defendant demonstrated in the record which seem grafted on plaintiff's usages and business promotion.

This action by plaintiff is for an injunction and other relief. The Official Referee has found that the acts of the defendant

constitute unfair business competition and has granted an injunction. The unfair competition pursued by defendant has been adequately demonstrated.

No one owns Santa Claus. The legend and the symbol have a solid place in the public domain. But where one business man has developed a special use of a word or symbol that has been open to anyone to use, a competitor may not unfairly appropriate the same concept to sow confusion from which he reaps a profit.

The use of the term " St. Nick ", and the portrayals of Santa Claus in connection with defendant's business, seem to have the single-minded design, aided by confusion and implicit misrepresentation, of attracting patrons seeking plaintiff's facility to come to the business establishment of the defendant; and this is an unfair competitive practice (*Matter of Playland Holding Corp.* v. *Playland Center,* 1 N Y 2d 300; *Wholesale Service Supply Corp.* v. *Wholesale Bldg. Materials Corp.,* 304 N. Y. 854; *Association of Contr. Plumbers* v. *Contracting Plumbers Assn.,* 302 N. Y. 495; *Winifred Warren, Inc.,* v. *Turner's Gowns,* 285 N. Y. 62; *Westcott Chuck Co.* v. *Oneida Nat. Chuck Co.,* 199 N. Y. 247). The injunction was warranted.

Besides the injunction, the judgment awards $125,000 in damages to the plaintiff. The view of the Official Referee stated in his opinion was that although damages disclosed in this record cannot be determined with mathematical certainty, the sum allowed was sufficient to compensate plaintiff " for the losses sustained " from defendant's practices.

One finding which implements the decision is that defendant's increased profits from 1950 to 1954 were at least $145,000 and that " Not all, but a substantial portion of such increased profits " resulted from defendant's unfair practices and that at least $125,000 " of such increased profits " resulted from the practices complained of. There is another finding in immediate context that plaintiff suffered " lost profits ", which as a proposed finding, is marked " Found except as to the amount of damages which I find to be $125,000."

Since the judgment allowed $125,000 in all as damages it seems fair to read the findings as not intending to allow each measure separately, one based on plaintiff's loss of profits and the other based on defendant's increased profits; and for the purpose of review we will treat them as having been made in the alternative.

The plaintiff's business did not decrease, but rather increased steadily and consistently during the period of defendant's unfair competitive practices. Plaintiff did a gross business, including

receipts from admissions, sales of toys and souvenirs and miscellaneous receipts, in 1950 of $417,006.21; in 1951, of $477,712.17; in 1952 of $542,327.21; in 1953 of $653,828.36; and in 1954 of $688,856.84.

The net profit realized by plaintiff on this very substantial gross business was a relatively small amount and showed marked fluctuations. In 1954, for example, on almost $690,000 gross business, the net profit was $23,734.07, a little more than 3%. The year before, in 1953, on over $650,000 the net profit was $80,124.65 or over 12%; in 1951 on $477,000 it was $49,074.25, or about 10%.

Receipts for admissions to plaintiff's project remained fairly stable from 1950 to 1954 with a gradual upward curve, from $178,557 in 1950 to $249,121 in 1954. Defendant's receipts for admissions were as follows: 1949, $22,921; 1950, $32,761; 1951, $52,874; 1952, $57,459; 1953, $48,899; 1954, $57,104. These receipts suggest the relative sizes of the two business operations.

The plaintiff's proof of damage is based on the theory that the year 1949, which was immediately before defendant began his unfair advertising practice, ought to be accepted as the level at which defendant's business would have continued had the unfair competitive practice not been engaged in; and that all the admissions from 1950 to 1954 inclusive, above the $22,921 in 1949, are to be attributed to customers of plaintiff, lured away by defendant's advertising practices. Thus in 1950, plaintiff claims $9,839 was thus diverted by defendant; in 1951, $29,952; in 1952, $34,537; in 1953, $25,977; and in 1954, $34,182.

These figures roughly average about 10% of the admissions of the plaintiff during this period. But from the loss of this relatively small part of its business, plaintiff claims that it lost an amount equivalent to nearly 100% of its profit during five years. To the actual five-year profit of $276,147.89, it claims the customers taken by defendant would have added $224,176 to plaintiff's profits if they had come into plaintiff's project.

This claim is based on the theory that for each dollar of admissions, the average customer would spend a certain average amount for purchases and other items in plaintiff's project; and that since certain expenses, such as overhead and administrative salaries would remain constant, the profit on these relatively few additional customers proportionately would be very large.

The actual course of business operations of plaintiff, however, does not suggest that the loss of the number of customers claimed to have been lured away by defendant would have had such an important effect on plaintiff's net profit.

On the contrary, sometimes an increase in admissions showed a lower net profit. For example, plaintiff's records show $4,522 more in admissions in 1951 than in 1950 ($183,079 against $178,557). Instead of showing the kind of increased net profit which the theoretical projections by the accountant suggest, the net profit of the plaintiff actually went down from $59,094.26 in 1950 to $49,074.25 in 1951. Again, plaintiff had an increase in admissions from $230,049 in 1953 to $249,121 in 1954; but a decline in net profit from $80,124.65 in 1953 to $23,734.07 in 1954.

There were, of course, other factors entering into the changes from year to year in plaintiff's profits which are explainable on the basis of specific calculations and for specific reasons; but these changes do cast doubt on the validity of the accounting theory of " projection " which seeks to establish that a relatively small number of increased admissions in each of the five years involved would necessarily bring in proportionately very much larger dollar profits than shown from the customers who actually did come to plaintiff's establishment.

If all the defendant's increased admissions as shown by plaintiff's proof be attributed to the unfair advertising practices from 1950 to 1954, it will be found that they total about $134,000. Plaintiff's accountant's projections show that on this amount of admissions, there would be additional sales and other business done of about $221,500 or a total gross, including admissions, of about $355,000.

The method of this computation of gross is illustrated by taking as an example the year 1954. On a calculation that $34,182 went to the defendant in admissions, which ought to have gone to plaintiff, some $60,502 additional sales are assumed to follow that number of admissions on an average, making a total projected loss of gross business of $94,684. In 1953, as an additional example, the loss of $25,977 in admissions is projected as causing an additional loss of $47,799 in sales.

If we take an average net profit of 10% of the projected gross of $355,000, we find plaintiff's loss of profits to have been about $35,000. The percentage approximates plaintiff's average of five years' net profit on its gross business. This, of course, is greatly less than the amount which plaintiff claims on the basis of its " projections " to have lost in profits, but this claim is based on assumptions which are inconsistent with the actual five years of experience with actual profit.

The theoretical claim of $224,176.52 of lost profit asserted by plaintiff seems especially high in view of the indications that a large part of the increased number of customers of the defendant's facility over the 1949 base year would not have patronized

the plaintiff, even if the defendant had not engaged in his unfair competitive practice. The proof showed also that some customers went to both establishments. There are factors other than the defendant's wrong which seem to have entered into the increase in defendant's admissions, including both the enlargement of his animal exhibits, the general increase in business in the area, and his advertising other than that which may be regarded as engrafted on plaintiff's promotion. We think that the amount of $35,000 we have arrived at fairly fits the case.

In the light of this conclusion, it is unnecessary to consider the extent of defendant's increased profits during this period when his admissions were increasing. There is a substantial dispute between the parties as to the defendant's profits; the proof adduced from defendant's own records, the accuracy of which plaintiff, however, challenges, shows he suffered losses during some of the years and a net profit only in the years 1951 and 1952.

The finding of the court below that defendant's increased profits for the period were at least $145,000 seems to have been the result of an obvious mistake in preparing the findings. Although defendant's records show a loss during the five-year period of $40,863.02, the accountant for the plaintiff in evaluating these records made adjustments, largely by eliminating expense deductions, of $145,241.82 by which he reached the conclusion that the net profit of the defendant for the period was $104,378.80. But according to his estimates the net profit of defendant in 1949 was $8,165.47, and if the continuance of this be assumed for five years as a fair base, it would amount to $40,827.35, so that the increased profit for the five-year period would be $63,551.45 rather than $145,000.

But this sum of $63,551 depends not only on a rejection of defendant's records which show a loss, and the acceptance of several accounting assumptions, but it also depends on the broader assumption that all of the theoretical increased profits are attributable to the unfair advertising practices and none to other factors in defendant's business.

We consider that the damages we find have a firmer foundation in the record than these assumptions. The basic rule of damage in a case of unfair business competiton is the amount which the plaintiff would have made except for the defendant's wrong. (*Michel Cosmetics* v. *Tsirkas,* 282 N. Y. 195.)

Appellants also argue that the practice in relation to an action for accounting which seems to be the form in which the complaint is cast, has not been followed strictly; that the right to an accounting must first be established and then the account

taken. The trial, however, was so conducted over a period long enough before the Official Referee sufficiently to allow fully for accounting; and the books and records have been so thoroughly sifted as to leave nothing more in doubt in respect of what they may contain.

For this reason, we think further examination of records and accounts would serve no useful purpose and we treat the accounting as having been made. Besides this, the complaint asked for further and incidental relief in addition to an injunction, and the theory of the decision is not accounting, but damage.

The judgment should be modified, on the law and the facts, by reducing the damage allowed to $35,000 and, as thus modified, affirmed, without costs.

ZELLER, J. (dissenting). Plaintiff's basic premise, as expressed in its brief, is that defendant has so imitated plaintiff's advertising, business and place of business that plaintiff's prospective customers are deceived and his business damaged. In my opinion the evidence in this case fails to establish these contentions.

Plaintiff calls itself " Santa's Workshop " and conducts an exhibit at North Pole, New York which it opened in 1949. In an area that amounts to the perimeter of an ellipse, plaintiff maintains what is described as a village, consisting of several buildings designated as Santa's house, a post office, blacksmith shop, several workshops, Saint Nick's Chapel, Mother Hubbard's house, and a barn. Near the center of the area, the North Pole is depicted by a refrigerated pole kept coated with ice and roaming about the village are tamed wild and domestic animals such as deer, sheep, goats and rabbits which customers are permitted to pet and feed. A live Santa Claus, who is attended by persons dressed as gnomes and elves and storybook characters such as Little Red Riding Hood, Little Bo-Peep, Snow White, Jack and Jill and Little Miss Muffet are also impersonated and present in the village. The entrance to the village is through a gateway over which is a cutout of Santa Claus in a sleigh being pulled by eight reindeer harnessed in pairs. The reindeer have been caricaturized as cartoon type animals with shorter noses and horns and bigger heads and other characteristics not found in nature.

The theme of the North Pole and Santa Claus, his home, his workshop, his gnomes and elves, and his tame animals has been widely used by plaintiff in its publicity and advertising. On the premises postcards are sold which show Santa, his sleigh

and reindeer; Santa, his white deer and the North Pole; Santa at home with his reindeer; the elves and gnomes at work; as well as various scenes in the village. Souvenirs and gifts bearing similar imprints are sold and have been widely distributed throughout the northeastern United States. The income from the sale of these postcards, souvenirs and gifts amounts to hundreds of thousands of dollars. Publicity for the enterprise has been wide spread by means of descriptive articles published in newspapers and magazines of national circulation. Writers of such articles have interchangeably used the names of Santa, Santa Claus, St. Nick, St. Nicholas and Kris Kringle in referring to the legendary character who dominates the theme of Santa's Workshop.

Defendant has been in business in the Adirondack area since 1915, or more than 30 years longer than plaintiff. He conducts two establishments at which he exhibits animals. One is located at Ausable Chasm and the other just on the outskirts of Lake Placid and prior to 1950 both of the defendant's places of business were known as " Sterling-Alaska Fur Farms " and were used principally to raise and display wild fur-bearing animals such as mink, wolves, lynx and beaver. In that year, defendant changed his name to " Sterling-Alaska Fur and Game Farms " and added tame deer, llamas, goats and donkeys which are allowed to roam free and which visitors may feed and pet. At about the same time, defendant changed his advertising and adopted the term " St. Nick's Animals " as an advertising slogan.

In his advertising defendant uses five large billboards which are dominated by a Santa seated in a sleigh drawn by three pairs of reindeer. A typical sign also contains the words " Fur and Game Alive and Tame. Here are 1000 St. Nick's Animals. Sterling-Alaska Fur and Game Farms, Lake Placid ". He also advertises in the Adirondack Guide. For example, in 1954 his full-page advertisement in the Adirondack Guide was captioned " St. Nick's Animals Are Calling You ". It contains a picture of a typical Santa Claus standing beside a white reindeer. It invites the reader to see 1,000 live mink, lynx, wolves, badgers, mountain sheep, deer, black bears and foxes. It also states that furs may be purchased at " less than wholesale ". The front fences of both of defendant's establishments prominently advertise his name in black letters three feet high and the fact that he has an animal exhibition. The fences advertise to prospective customers a list of animals on exhibit. Over the entranceways are large cutouts of Santa Claus and a white deer. Also over

the Ausable Chasm entranceway is a large billboard of Santa Claus seated in a sleigh drawn by eight reindeer with the legend in large letters " Here Are 500 St. Nick's Game and Fur Animals ".

Thus, it is evident that there are marked distinctions between plaintiff's business and defendant's business, and plaintiff's advertising and defendant's advertising. True, both parties use caricatures of Santa Claus in advertising but defendant, by accompanying words, carefully distinguishes his business from plaintiff's. To affirm the judgment granted by the Official Referee is to hold that plaintiff, simply by using caricatures of Santa Claus for a few months before defendant did, has thereby acquired a monopoly on the use of such caricatures in the Adirondack area.

Plaintiff in its own advertising has never stressed the term " St. Nick's Animals " in referring to the tame pets roaming its village. It is not unreasonable for defendant to refer to the many animals in his establishment which are usually associated — as is Santa Claus — with the far north as " St. Nick's Animals ". Santa Claus and St. Nick, like Jack Frost, the Easter Bunny, Uncle Sam and Father Time, are names in the public domain. Because plaintiff has a St. Nick's Chapel should not exclude defendant from having " St. Nick's Animals " where defendant, by use of words and means, so adequately distinguishes his business from plaintiff's.

Judge LEARNED HAND expressed the rule of unfair competition very succinctly when he wrote in *Yale Elec. Corp.* v. *Robertson* (26 F. 2d 972, 973) : " The law of unfair trade comes down very nearly to this * * * that one merchant shall not divert customers from another by representing what he sells as emanating from the second ". Considering all the factors involved, it appears to me that defendant does not represent his establishments as being that of plaintiff. The judgment should be reversed and the complaint dismissed.

COON, HALPERN and GIBSON, JJ., concur with BERGAN, J.; ZELLER, J., dissents, in an opinion, and votes to reverse the judgment and dismiss the complaint.

Judgment modified, on the law and facts, by reducing the damages allowed to $35,000 and, as thus modified, affirmed, without costs. Settle order.