The **NORWICH PHARMACAL CO.,**
Plaintiff,

v.

**STERLING DRUG, INC., Defendant.**

**Civ. No. 6010.**

United States District Court
N. D. New York.

Aug. 1, 1958.

428

Hancock, Dorr, Ryan & Shove, Syracuse, N. Y., Lewis C. Ryan, Philip T. Seymour, Syracuse, N. Y., of counsel, Davis & Gilbert, New York City, John D. Hayes, Norwich, N. Y., George A. Elber, New York City, of counsel, for plaintiff.

Cahill, Gordon, Reindel & Ohl, New York City, James A. Fowler, Jr., David Rasch, C. Kenneth Clark, Jr., New York City, of counsel, Kernan & Kernan, Utica, N. Y., James Kernan, Jr., Utica, N. Y., of counsel, for defendant.

BRENNAN, Chief Judge.

The overlapping of the requirements of free competition and ethical business practices is the problem involved in this litigation.

The action, originally brought in the state court, seeks an injunction and money damages based upon the allegations that the defendant is competing unfairly in the imitation, manufacture and distribution of its product, Pepsamar, which is sold in competition with the plaintiff's product, Pepto-Bismol. Upon the trial, the claim for damages was waived and the problem is reduced to a determination as to whether or not injunctive relief is warranted.

Jurisdiction of this court is based upon diversity of citizenship. The New York law of unfair competition applies (Maternally Yours, Inc. v. Your Maternity Shop, 2 Cir., 234 F.2d 538, note 1 at page 540) which is expressed by the following quotation taken from Santa's Workshop v. Sterling, 232 App. Div. 328, at pages 329–330, 122 N.Y.S.2d 488 at page 489. " * * * 'The controlling question in all cases where the equity

power of the courts is invoked is whether the acts are fair or unfair, according to principles recognized in equity'. Oneida, Ltd. v. National Silver Co., Sup., 25 N.Y.S.2d 271, 276. See, also, Avon Periodicals v. Ziff-Davis Pub. Co., Sup., 113 N.Y.S.2d 737, affirmed 282 App.Div. 200, 122 N.Y.S.2d 92". The above decision is cited in our own Circuit Court of Appeals in Noma Lites v. Lawn Spray Co., 222 F.2d 716, at page 717. Concisely stated, the existence of unfair competition is a question to be decided upon the particular facts of each case with an appreciation of the necessity for free competition within the limits of ethical business practices. A thorough appraisal of the facts is therefore necessary.

The Norwich Pharmacal Company, hereinafter referred to as "Norwich", is a New York corporation, having its principal place of business at Norwich, New York. It has been engaged in the business of manufacturing drug and pharmacal products since about 1885. It was incorporated in 1890. It has conducted a successful and growing business over the intervening period of years. The total money value of the sales of all of its products amounted to about $33,600,000 in 1957. Its product, involved in this litigation, is known as "Pepto-Bismol".

Defendant, Sterling Drug, Inc., hereinafter referred to as "Sterling", is a Delaware corporation with its principal place of business in New York City and is authorized to do business within the State of New York. It has likewise been in the business of manufacturing and selling drug and pharmacal products for a number of years. That it has enjoyed a progressive growth is apparent from the fact that its total sales for the year 1956 were about $177,700,000, and that it operates through some 20 to 40 subsidiaries. Its product, involved in this litigation, is known as "Pepsamar".

The Norwich product, Pepto-Bismol, is a liquid pharmaceutical preparation intended primarily for the relief of temporary stomach distress. It has been producing and selling this product continuously since about 1900 and the name "Pepto-Bismol" was applied thereto and used continuously since early 1919. The active ingredients of the product appear upon the label of each bottle and have not at any time been essentially changed. Pepsin was eliminated as an ingredient some years ago when it was found to have no therapeutic value. Improvements in the matter of obtaining a more stable liquid were made over a period of years, but the product has undergone no essential change since the time it was first placed on the market. A feature much discussed in the evidence and in the briefs is that Pepto-Bismol has always been marketed as a liquid, opaque pink in color. This color is artificial and is obtained by the addition of a minute quantity of food coloring. It is apparent that the color or the ingredient producing same has no therapeutic or medicinal value in itself. The product is flavored with a wintergreen flavor. The ingredient producing same was at one time referred to as an active ingredient in the preparation but has been eliminated therefrom since it also has no therapeutic value. As a result of efforts over a period of time, Norwich succeeded about 1950 in so perfecting the manufacture of Pepto-Bismol as to attain a practically stable suspension therein—that is, the insoluble ingredients would not separate, dropping to the bottom of the container and leaving a clear liquid at the top.

Pepto-Bismol is marketed in a clear colorless glass bottle, triangular in shape. The name "Norwich" is molded into the glass on each of its three sides, near the top. This form of container has been used since about 1925. Attached to the bottle is a wraparound label with a yellow background. The face or front of the label contains the words "Pepto-Bismol" in large red letters, the word "Pepto" appearing as an upper line and the word "Bismol" appearing just below. The name, as described above, occupies about one-half of that portion of the label intended for customer view. Immediately beneath the name are the words "For

Upset Stomach", the word "Upset" being emphasized by its size and the irregular position of the letters composing same. On another side of the label is contained the directions for the use of the product and a statement of its active ingredients. The third side recites in ordinary print the purpose or symptoms for which the product is to be used. The bottle itself is designed for and contains eight fluid ounces of the product.

Pepto-Bismol has been advertised on a national scale for over twenty-five years. Magazines of national and sectional circulation, newspapers, radio and television have been used. Display cards and even comic strips have been also used intermittently. It is fair to say that in the advertising, above mentioned, the pink color of the Pepto-Bismol has been emphasized. Such advertising efforts have been intensified over a period of years so that more than $2,000,000 were expended in advertising and promotion of the Pepto-Bismol product in each of the years 1954 and 1955. The product has enjoyed a constantly increasing volume of sales. In 1955, the sales of Pepto-Bismol amounted to about $7,600,000 which represents about 30% of the total of Norwich's sales for that year. Norwich has achieved a wide distribution of its Pepto-Bismol product. It is available for customer purchase in about 99% of the drug stores in the United States. In addition, it is distributed in increasing volume in stores and shopping centers where proprietary medicines are displayed for consumer purchase. To summarize, Pepto-Bismol is a nationally known product, enjoying a favorable public reception.

Sterling's product, "Pepsamar", is practically a carbon copy of Pepto-Bismol insofar as its ingredients, color and its intended functions are concerned. It was first manufactured in a limited amount for the purpose of an area marketing test in October 1955. Shortly thereafter, it was placed upon the market in direct competition with Pepto-Bismol. The product was the result of investigation and experimentation commencing in 1953. After an investigation into the sales practices of Norwich and the sales records of Pepto-Bismol and an analysis of the product itself, the laboratory department of Sterling was instructed by its president to manufacture a product "as near as possible to Pepto-Bismol". This included the copying of the pink Pepto-Bismol color as closely as possible. Although a considerable amount of evidence was taken as to the identity of the two products, it need not be labored here since Sterling admits, in its brief, "as to the product itself, the stuff inside the bottle, Sterling has frankly admitted that its product was intended to be very similar to Pepto-Bismol, just as close as the laboratory could make it".

Sterling's new product was finally given the name "Pepsamar". This name had been used by Sterling in the marketing of a product apparently also designed for the relief of stomach distress and marketed only in South America or foreign markets. It is entirely a different product from the Pepsamar involved in this litigation. It is known as an ethical product, dispensed by physicians and not sold over the counter to the public. The old Pepsamar does not resemble in appearance or composition the Norwich product Pepto-Bismol.

New Pepsamar is marketed in a clear, flat glass bottle with labels on the front and back. Upon the front label, which is composed of a white and blue background, the word "Pepsa" appears in large blue letters upon the upper line and the word "mar" immediately beneath. These two lines occupy over one-half of the front label. Immediately below are the words "For Upset Stomach" on a sort of waving pennant background. The back label contains the directions for the use of the product, the ingredients thereof and the symptoms or conditions which are appropriate for its use.

Sales promotion of the new Pepsamar and the advertising thereof commenced in about October 1955. Radio, television, newspaper and display pieces were the advertising media principally used. In color advertising, the pink colored bottle

is featured and in black and white advertising, the product is referred to as a pink liquid. Up until 1956, the description of Pepsamar as a gentle pink liquid was used in both radio and television advertising. This reference was eliminated after the commencement of this action. The phrase "for upset stomach" has also been used in Pepsamar advertising, substantially in the same manner as in the Pepto-Bismol advertising. Sales of the new Pepsamar, like Pepto-Bismol, are made through drug stores and food stores. It is generally offered in either four or eight ounce bottles. Up to the time of the trial, the sales of new Pepsamar amounted to about $90,000 with about one-half of those sales in the State of Ohio. The Sterling company has spent about $512,000 in advertising and sales promotion of its new product.

The contention of Norwich here is not directed to the copying of the formula for its product, Pepto-Bismol, but that it contends that Sterling has so imitated same in its non-functional attributes and advertised and marketed its new Pepsamar in such a manner as to confuse the buying public, to destroy Norwich's property rights to a degree which would be considered unfair in the light of ethical practices required of business competitors. Its contention is based principally upon the almost exact imitation of the color of Pepto-Bismol, the imitation of the emphasis upon the pink color which has been stressed in Pepto-Bismol advertising and is likewise stressed in Pepsamar advertising, the emphasis upon the words "upset stomach" upon the Pepsamar label and in advertising, similar to the label and advertising previously used over a long period of time by Pepto-Bismol and the splitting of the name Pepsamar into two parts upon the label, similar to such an arrangement of the label of Pepto-Bismol.

Sterling admits imitation of the product but denies unfairness in the sale or distribution thereof. It contends that no one has a monopoly upon the pink color that has long been used in remedies designed for the alleviation of stomach distress and that it has a therapeutic value in the sense that it is attractive and soothing to those suffering therefrom. Sterling contends that the words "upset stomach" have also been used extensively over a period of years in the description and advertising of stomach distress remedies. It contends that the splitting of the word Pepsamar into two parts was occasioned for the same reason that Pepto-Bismol was placed in two lines by Norwich about 1953, to wit: to make same more legible to customers who must view the product across a counter or at some little distance.

The resolution of the above contentions must depend upon the determination as to whether the appropriation by Sterling of the non-functional attributes of Pepto-Bismol and the similarities in advertising, in marketing the two competing products are such as to trespass upon Norwich's property rights and likewise to result to confusion to the buying public. Any approach to such determination involves a resolution of the dispute as to whether or not the use of pink color in either of the competing products is functional.

■ It is not disputed that the pink color and the ingredient producing same have no healing value in themselves. It is designed to present a pleasing appearance to the customer and to the sufferer. It is readily understood that a disordered stomach will accept that which is pleasing and reject that which is repulsive. It is designed to aid in public acceptance. Sterling claims it has a soothing effect upon those suffering from nervous stomach disorders. The court is constrained to find that the pink color has no functional value as the word is commonly used and understood. Pleasing appearance and acceptance is a matter of individual preference. Common knowledge of prominent stomach distress remedies contradict the fact that the pink color of the competing products is other than a preferred dress of the products involved. The action of Sterling in its use of the pink color is confirmatory of the fact that its object was to imitate

Pepto-Bismol rather than to improve its formula. Sterling made no tests of color acceptance. It apparently chose the same shade of pink color found in Pepto-Bismol as being the ultimate in therapeutic value if its argument is to be adopted. It is indeed peculiar that the particular shade of pink found in Pepto-Bismol is a necessary requirement of free competition where other shades and other colors are apparently rejected without reason appearing in the evidence. The finding here is that the pink color, used by Sterling in its Pepsamar product, is non-functional and was adopted by Sterling as an intentional imitation of the appearance of the Pepto-Bismol product. Such finding might rest alone upon the testimony of the Chairman of the Board of Directors of Sterling as indicated by the following question and answer.

"Q. Who made the decision with respect to the color of this product?

"A. Dr. Tainter, I guess, although on my instructions that it should be similar to Pepto-Bismol. He would obviously come up with a pink color."

■■ To summarize, in addition to any argument which is made as to the similarity of the name of the competing products, Sterling has appropriated the non-functional color and flavor of the Norwich product. It features in its advertising the pink color of its product similar to the advertising of Pepto-Bismol. It uses the slogan "for upset stomach" prominently upon its label and in its advertising in a manner comparable to that used upon the product and in the advertising of Pepto-Bismol. The name "Pepsamar" is placed upon the label in a manner similar to that of Pepto-Bismol. It is displayed and advertised as a new remedy for upset stomach although its ingredients, its intended use and the directions for its use are similar to that of Pepto-Bismol. Is such conduct unfair is the ultimate question here. Before reaching that question, a word should be said relative to the prior use of the pink color. Such use has already been referred to in the advertising of Pepto-

Bismol and it is readily understood that such color is associated with that particular product. The evidence discloses convincing proof of its wide acceptance and of the public association of a pink colored stomach remedy with Pepto-Bismol. It is no answer to say that other manufacturers had used the same color in the marketing of proprietary medicines intended for similar use. That others have trespassed does not relieve Sterling. The actions of others may not amount to noticeable damage to the plaintiff. The extent of the threat is the measure of Norwich's requirement to protect its product. In addition, it is not the color alone upon which Norwich relies for injunctive relief. Rather it is the intentional misappropriation of the non-functional attributes which help to make up the identity of its product. It is true that the pink color belongs in the public domain but it may not be used by a competitor in such a way as to act as a means of persuasion that it represents the product of another. The same argument was used in Santa's Workshop v. Sterling, 2 A.D. 2d 262, 153 N.Y.S.2d 839, affirmed 3 N.Y. 2d 757, 163 N.Y.S.2d 986, where the court rejected the contention that the words "St. Nick" and the portrayals of Santa Claus, although in the public domain, may be used to confuse or misrepresent.

While the ultimate decision is essentially factual, it must rest upon the individual conception of fairness among commercial competitors according to the standard recognized by the trier of the facts. Such decision however must be guided and limited by legal precedents, and it may be added that the court sees no essential difference in principle between state and federal decisions.

■ The concept of unfair competition is no longer limited to the "palming off" of one's product as that of another but is equally applicable to situations where there is an appropriation of that which equitably belongs to a competitor. The case of International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, is most frequent-

ly cited as an authority but the principle is recognized by a long line of both state and federal decisions. The origin and evolution of the law of unfair competition is discussed at some length in Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y. S.2d 483, affirmed 279 App.Div. 632, 107 N.Y.S.2d 795, and substantially repeated in Dior v. Milton, 9 Misc.2d 425, 155 N. Y.S.2d 443, affirmed 2 A.D.2d 878, 156 N.Y.S.2d 996.

■ That the product involved has acquired a secondary meaning is no longer required as a basis for an action in unfair competition under the state law. Santa's Workshop v. Sterling, 282 App. Div. 328, 122 N.Y.S.2d 488; Avon Periodicals v. Ziff-Davis Pub. Co., 282 App. Div. 200, 122 N.Y.S.2d 92. Such a holding by the New York courts seems to have been anticipated by our own Circuit Court of Appeals (Artype, Inc. v. Zappulla, 228 F.2d 695, at page 698).

■ Actual deception need not necessarily be shown. The likelihood of confusion is sufficient upon which relief may be based. American Chain Co., Inc. v. Carr Chain Works, Inc., 141 Misc. 303, at page 306, 252 N.Y.S. 860, at page 864; Ronson Art Metal Works v. Gibson Lighter Co., 3 A.D.2d 227, at page 231, 159 N.Y.S.2d 606, at page 610; Mark Realty Corp. v. Hirsch, 180 App.Div. 549, 168 N.Y.S. 244. See also American Chicle Co. v. Topps Chewing Gum, 2 Cir., 208 F.2d 560 and N.Y.General Business Law, McKinney's Consol. Laws, c. 20, Sec. 368-c, subd. 3.

■ Where one party has intentionally copied the nonfunctional attributes of another's product, he must assume the burden of showing that no likelihood of confusion will arise. This is especially true where as here the copying of such attributes was deliberate and intentional, even to the point where Sterling's president expressed the desire to use the triangular bottle of the Pepto-Bismol product in the following words —"We wish we could use your triangular bottle but we can't". Mastercrafters

Clock & Radio Co. v. Vacheron, etc., 2 Cir., 221 F.2d 464, at page 467; My-T Fine Corp. v. Samuels, 2 Cir., 69 F.2d 76, at page 77.

■ Applying the above rules, we inevitably come to the finding that Sterling is competing unfairly. Its admitted intention is to simulate Pepto-Bismol as nearly as the law would allow. Free competition, so necessary in our economic life (Charles D. Briddell, Inc. v. Alglobe Trading Corp., 2 Cir., 194 F.2d 416) does not countenance the assumption of a competitor's identity. Pepsamar's pink color was not adopted because of its alleged therapeutic value, its soothing qualities or its use in similar remedies. The undisputed evidence is that it was adopted for the sole reason that it was an attribute of Pepto-Bismol. This fact alone would seem indicative of the intention to trade upon the dress of a competitor and taken together with the exploiting of the pink color in its advertising would constitute unfair competition. It is neither necessary nor proper to evaluate each non-functional appropriation above referred to. Unfair competition is based upon the appropriation of the non-functional attributes of Pepto-Bismol as a whole rather than upon the sum of its parts appraised individually.

■ Retaliation for an imaginary or real pre-existing wrong does not change the character of Sterling's acts. Ethical business practices and the morals of the market place (Germanow v. Standard Unbreakable Watch Crystals, 283 N.Y. 1, at page 15, 27 N.E.2d 212, at page 217) permits no justification upon any such principle. Sterling may produce and sell a better or cheaper remedy than Pepto-Bismol based upon its formula. The common standards of fair dealing prohibit further encroachment. The conclusion that an injunction should issue, follows.

■ In considering the form of the relief to be granted, the following quotation from Ronson Art Metal Works v. Gibson Lighter Co., 3 A.D.2d 227, at page 231, 159 N.Y.S.2d 606, at page 610,

is appropriate. "The relief granted should be tailored to achieve the nice balance of adequately redressing the wrong without the imposition of punishment for the exercise of a legitimate business function". It is therefore concluded that the plaintiff is entitled to an injunction restraining the defendant from simulating the pink color of Pepto-Bismol in its product, Pepsamar. If Sterling, however, desires to continue to use the pink color of its product, Pepsamar, same shall be distributed in the blue colored glass bottle, (or other colored container concealing the pink color of its contents) which is used by Sterling in the marketing of many of its products. The injunction so granted shall restrain the defendant from the use of the descriptive pink color in the advertising of its Pepsamar product.

The above will constitute the findings of fact and conclusions of law in accordance with Rule 52 Fed.Rules Civ.Proc. 28 U.S.C.A. If the form of the judgment is not agreed upon, it may be settled on five days notice, and it is

So Ordered.