**HYGIENIC SPECIALTIES CO., Plaintiff,**
v.
**H. G. SALZMAN, INC., Hutzler Mfg. Co. and C. B. Cotton & Co., Inc., Defendants.**

United States District Court
S. D. New York.
Dec. 6, 1960.

Harry Price, New York City, for plaintiff.

Jerome Bauer, Mineola, N. Y., for defendants.

MacMAHON, District Judge.

This is an action for damages for infringement of plaintiff's design patent on a plastic soap dish. Plaintiff also seeks to recover for trademark infringement and unfair competition.

The issue of patent infringement was tried before a jury which found the patent valid and infringed by the defendants H. G. Salzman, Inc. and Hutzler Mfg. Co. Although the defendants stipulated that defendant C. B. Cotton & Co., Inc., had molded the infringing soap dish, the jury found, nevertheless, that Cotton had not infringed the patent.

On motion, at the conclusion of the trial, the Court dismissed for failure of proof counterclaims for unfair competition and for a *qui tam* penalty. The issues remaining for decision are: (1) plaintiff's claim for unfair competition; (2) plaintiff's claim for trademark infringement; (3) plaintiff's motion for judgment against C. B. Cotton & Co., Inc., notwithstanding the verdict; and (4) damages suffered by plaintiff. The parties stipulated not to submit the question of damages to the jury, but to reserve this for the Court's determination.

The material facts relevant to the claim for unfair competition are in the main not disputed. Barnet Kaplan, a semi-retired accountant, and Abner Weiner, a part-time salesman, organized Hygienic Specialties Co. in 1947 to manufacture and sell a soap dish which Kaplan had designed. The soap dish consists of a 4½″ by 3½″ dish, approximately 1⅛″ deep, supporting a latticed tray which holds a bar of soap above the bottom of the dish. The bar of soap is kept dry by the dripping of excess water into the dish where it is held out of contact with the soap. Originally the product was made of cellulose acetate in various colors and was sold by Hygienic to jobbers and wholesalers in either individually wrapped packages or in bulk lots for ultimate sale to the public at 39 cents each.

The organizers, who devoted only part of their time to Hygienic's fledgling business, retained representatives to sell the product. The business prospered in a modest way, and by 1949 Hygienic's annual net profits had reached approximately $6,000.

In 1949, Hygienic engaged defendant Salzman, an established sales representative for several manufacturers of housewares, as its exclusive sales representative in the New York metropolitan area, Northern New Jersey, and the City of Philadelphia. Salzman was in the nature of a wholesaler or jobber who sold plaintiff's soap dish to retailers for a stipulated commission. Defendant Hutzler was one of the Hygienic accounts which purchased plaintiff's product through Salzman.

In February 1954, Hygienic, whose net earnings had then reached $15,000 a year, began making its soap dishes in colored polyethylene acetate, with the name "Hygienic" molded on the bottom, and packaging them individually in translucent bags made of the same material. At that time, plaintiff stapled to the top of its packages a four inch cardboard label, folded in the middle to present a two inch surface on each side. This form of label was referred to throughout the trial as a "saddle top". Plaintiff's saddle top was colored red, white and blue, with the word "Hygienic" prominently displayed.

At about the same time, Hutzler Mfg. Co. was purchasing plaintiff's polyethylene soap dishes in bulk and was packaging them individually in identical poly-

ethylene bags with the same size saddle top, colored, however, yellow, blue and white. The Hutzler label also displayed the word "Hygienic" on one side, but the name "Hutzler" appeared on the other.

Early in 1954, Hutzler, after complaining that its margin of profit was too small, began negotiating with Hygienic for either an exclusive license to sell Hygienic's soap dishes throughout the United States, or an outright purchase of Hygienic's rights. These negotiations ended in failure in May, 1954, and Hutzler continued to buy and resell Hygienic's soap dishes as before.

Sometime during the period between May and November, 1954, however, Hutzler secretly arranged to have nearly identical soap dishes made by defendant Cotton but the name "Hutzler" was molded on the bottom. Prior to defendant's copying, Hygienic's soap dish was readily distinguishable from all other soap dishes then on the market by virtue of its unique design and appearance.

On November 17, 1954, Salzman advised Hygienic that it was terminating its services as Hygienic's representative, as of November 22, and on the very same day notified its customers that it no longer represented Hygienic and that thereafter it would sell Hutzler's soap dishes. Some customers, in turn, informed Hygienic of what Salzman and Hutzler were doing.

Since November, 1954, Hutzler has sold over one million two-piece polyethylene soap dishes, under its own label, packed in a translucent bag identical to Hygienic's. Although the bag is translucent, it effectively clouds the name on the bottom of the enclosed soap dish as well as minor differences in design. Hutzler's package also displays a soft cardboard saddle top label, colored yellow, green and white, on which the word "Sanitary" has replaced the word "Hygienic". Hygienic's business, on the other hand, has, since the events of November, 1954, declined to the point where its net profits approximate what they had been in 1949 between $6,000 and $7,000 a year.

At the trial, the Court submitted to the jury, for an advisory verdict, the following questions which the jury answered affirmatively:

"Did the defendants intend to divert or switch plaintiff's customers to themselves by means of deceptive similarities between their soap dish and the plaintiff's soap dish?

"Did the defendants intend to divert or switch to themselves by means of deceptive similarities in the general appearance of their soap dish, packaging and labeling as a whole unit, as compared to the general overall appearance of the plaintiff's packaged soap dish?"

The Court agrees that the evidence amply supports the jury's affirmative answers to these questions. It is evident from a mere comparison of the two packaged products that defendant's imitation of the plaintiff's soap dish, as well as its style of packaging and labeling, is so slavish that there can be no doubt that buyers would be misled by the deceptive similarities to conclude that both soap dishes were produced from the same source. This is the more so when defendants treacherously substituted their copy into the same market through the identical channels of distribution previously enjoyed by the plaintiff. Indeed, it would be difficult to find a clearer case of imitating a successful product with a deliberate and wilful intent on the part of defendants to deceive and confuse the public for the purpose of pirating plaintiff's customers and good will. That their deceit was effective seems clear despite the absence of direct evidence of confusion from balancing the sharp decline in Hygienic's sales against the sudden success of the defendants' imitation.

Despite this, defendants contend, however, that plaintiff's claim of unfair competition must fail because plaintiff failed to establish that its product had acquired a secondary meaning. There can be no doubt that plaintiff failed to prove that its soap dish was associated with the plaintiff in the mind of the buy-

ing public. The jury so found in its advisory verdict, and the Court agrees with the jury's conclusion. It does not follow, however, that plaintiff cannot recover for unfair competition. "The controlling question in all cases where the equity power of the courts is invoked is whether the acts are fair or unfair, according to principles recognized in equity." Santa's Workshop v. Sterling, 3d Dept.1953, 282 App.Div. 328, 122 N.Y.S.2d 488, 489.

Thus, in the instant case, although it is quite evident that a casual buyer of these soap dishes would readily be misled by the deceptive similarities foisted on the public by the defendants that both products emanated from the same source, it is unlikely that any buyer would identify that source as the plaintiff or, for that matter, give any thought at all to the identity of the producer. Manifestly, a purchaser of this simple and inexpensive household item, as he pushes his cart through the supermarket, relies not on the reputation of the producer, but upon the apparent quality and eye appeal of the product itself. But the existence of a secondary meaning attaching to the unique appearance of the plaintiff's soap dish is not precluded by the mere fact that buyers would not associate it with the plaintiff. Harm to the plaintiff results from the likelihood of a loss of customers or loss of reputation, or both. "Such loss can result from the customer's belief that the competing article derives from the same source as that of the party complaining; and it matters not whether the customers know just who is the source." Mastercrafters C. & R. Co. v. Vacheron & Const.-Le C. W., 2 Cir., 1955, 221 F.2d 464, 466. Thus, in Noma Lites v. Lawn Spray, 2 Cir., 1955, 222 F.2d 716, the advertising and packaging of the products were so similar as to entitle the plaintiff to protection without a showing of secondary meaning. Cf. Avon Periodicals v. Ziff-Davis Pub. Co., Sup.Ct.1952, 113 N.Y.S.2d 737, 744, affirmed 1st Dept.1953,

282 App.Div. 200, 122 N.Y.S.2d 92, 94. This is especially so as to satisfied customers buying another soap dish like the one they, or their neighbor or friend, bought last week at the same store. It was this good will earned by the plaintiff's efforts that defendants palpably appropriated when they disloyally ceased to represent the plaintiff and deliberately switched the plaintiff's customers to themselves. Defendants' deliberate deception, coupled with Salzman's infidelity, is the touchstone to defendants' inequitable conduct. Cf., Gaylord Products v. Golding Wave Clip Co., D.C.W.D.N.Y. 1958, 161 F.Supp. 746. Clearly, in a case such as this, where plaintiff's product is unique on the market, defendants' imitation is a "palming off" calling for the aid of a Court of equity. Nor is there anything in Speedry Products, Inc. v. Dri Mark Products, Inc., 2 Cir., 1959, 271 F.2d 646, or Norwich Pharmacal Co. v. Sterling Drug, Inc., 2 Cir., 1959, 271 F.2d 569, requiring a contrary result. Both of those cases expressly recognize that classic proof of secondary meaning is not a necessary factor in all cases of unfair competition.

The law of unfair competition has been, and is, in a state of flux, but the courts of New York [1] and of this circuit have been in the van of a trend toward narrowing the gap between what is merely commercial immorality and what is in fact unlawful competition. J. R. Wood & Sons, Inc. v. Reese Jewelry Corp., 2 Cir., 1960, 278 F.2d 157, 160. See e. g., Santa's Workshop v. Sterling, 3d Dept.1956, 2 A.D.2d 262, 153 N.Y.S.2d 839, affirmed 1957, 3 N.Y.2d 757, 163 N.Y.S.2d 986, 143 N.E.2d 529; Restatement, Torts, Vol. III, p. 540.

The Court of Appeals, in J. R. Wood & Sons, Inc. v. Reese Jewelry Corp., supra, reiterated these principles. Although trademark infringement was there in issue, the principles are equally applicable here. They are: (1) intent to

palm off; (2) geographic sales area, and (3) degree of similarity in appearance. All of these elements are present here.

Both Hutzler and Salzman were in agency relationships with the plaintiff and in the course of these certainly knew how well plaintiff's product was received on the market. Agency relationships are burdened with a duty of loyalty. Yet when Hutzler was unable to get more favorable terms, the evidence is clear that it connived with Salzman to eliminate the plaintiff, substitute its product into the same channels of distribution, and reap the market which had been developed by plaintiff. When Kaplan complained to Salzman about the substitution of Hutzler's imitation, Salzman replied, "So what of it? You can do what you want about it."

■ Clearly these defendants were prohibited by fiduciary ties from acting in any manner inconsistent with their trust and to exercise the utmost good faith and loyalty in the performance of their agency. Yet both of them palpably imitated the plaintiff's product, eliminated the plaintiff, and diverted its customers to themselves in an unconscionable appropriation of opportunities gained in their fiduciary capacities. Surely such conduct is intolerable and unfair. Duane Jones Company, Inc. v. Burke, 1954, 306 N.Y. 172, 117 N.E.2d 237. The evidence here admits of no other conclusion.

Hutzler's offer to buy out Hygienic was rejected in May, 1954, and the actions thereafter of both Hutzler and Salzman require a finding that they then determined to combine their efforts to copy plaintiff's successful product and eliminate Hygienic. The delay until November, 1954 was obviously caused by the preparation necessary to put their own soap dish into production. Hutzler and Salzman acted in concert to appropriate unfairly to themselves plaintiff's business. Hutzler, by having Cotton mold an almost identical product, pirated Hygienic's product to its own benefit without compensating Hygienic for its industry and ingenuity.

Recently the Court of Appeals for the Eighth Circuit found unfair competition where a customer, in the position of Hutzler, who supplied retailers with the plaintiff's paint, terminated its contract with the plaintiff manufacturer and had a similar product copied. Stewart Paint Mfg. Co. v. United Hardware Distrib. Co., 8 Cir., 1958, 253 F.2d 568, modified on rehearing, 8 Cir., 1958, 259 F.2d 273. And in Raycarr Sales Corp. v. Herman Rynveld's Son Corp., 1st Dept.1956, 1 A.D.2d 952, 150 N.Y.S.2d 619, the Appellate Division unanimously reversed a lower court decision dismissing a counterclaim against a manufacturer's representative who, like Salzman, had sold a competing product.

Undoubtedly, the activity of Salzman and Hutzler is so manifestly unfair that it constitutes that "gun at the head" competition which the New York Court of Appeals condemned in the Duane Jones case.

### Trademark Infringement

■■ Plaintiff's claim of trademark infringement is rejected because the plaintiff failed to show on the trial that the term "Hygienic", as used in connection with its product, had acquired the rights of a trademark. A mark which is merely descriptive of the article manufactured and which can be employed with truth by other manufacturers is not entitled to legal protection as a trademark. Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 1953, 206 F.2d 144, certiorari denied 1953, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377.

In this case, "Hygienic" was used in a descriptive sense and was employed in a general manner. Indeed, plaintiff's advertising appears to have stressed the term "2 Piece" as much as "Hygienic". Furthermore, there is no proof that the defendants used the term "Hygienic" after November, 1954, and it is abundantly clear that the plaintiff permitted, or at least acquiesced in, its use by the defendants before that time.

### Judgment Notwithstanding Verdict Against C. B. Cotton & Co., Inc.

 Plaintiff's motion for judgment against C. B. Cotton & Co., Inc., notwithstanding the verdict in Cotton's favor, is granted. It was stipulated that Cotton molded the soap dishes for the defendants. Hutzler testified that Cotton had molded between one and two million of the infringing dishes. Unquestionably, Cotton was an infringer. 35 U.S.C.A. § 271.[2] Just as a single sale of an infringing article may be sufficient to establish infringement, B. B. Chemical Co. v. Cataract Chemical Co., D.C.W.D.N.Y. 1938, 25 F.Supp. 472, so also the manufacture of a single infringing item subjects the maker to suit for infringement. Caterpillar Tractor Co. v. International Harvester Co., 9 Cir., 1939, 106 F.2d 769.

Here it is undisputed that Cotton manufactured not one but more than a million of the infringing soap dishes. The Court clearly charged the jury on Cotton's participation in the proscribed activities almost in the language of the statute. The jury, having found the patent valid and infringed, its verdict in favor of Cotton was clearly against the evidence. The judgment hereby directed against Cotton is limited to the patent infringement claim.

### Damages

 The parties stipulated not to submit the issue of damages to the jury on the patent infringement suit, but to reserve the same for determination by the Court in connection with its ruling on the unfair competition case. On review of the record, however, I find the evidence insufficient on which to base a determination of damages either for patent infringement or for unfair competition. Damages cannot be awarded on the basis of speculation or sheer guess as would be necessary on the proof now before the Court. Accordingly, the Court will direct a reference of the matter to a Special Master, to be appointed in the order to be entered herein, to take evidence and report to the Court on the issue of damages.

This opinion shall constitute my findings of fact and conclusions of law. Submit judgment on notice providing for reference to a Special Master on issue of damages, pursuant to Rule 53 of the Rules of Civil Procedure, 28 U.S.C.A.

---

**2.** 35 U.S.C.A. § 271 reads:
  "(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."