The **UPJOHN COMPANY**, Plaintiff-Appellant-Appellee,

v.

David **SCHWARTZ**, doing business as Bryant Pharmaceutical Company, Defendant-Appellee-Appellant.

No. 288, Docket 23540.

United States Court of Appeals Second Circuit.

Argued April 3 & 4, 1957.

Decided June 21, 1957.

Kenyon & Kenyon, New York City (Ralph L. Chappell and Hugh A. Chapin, New York City, of counsel), for plaintiff-appellant-appellee.

Arthur D. Herrick, New York City (Morton L. Leavy, New York City, of counsel), for defendant-appellee-appellant.

Before CLARK, Chief Judge, LUMBARD, Circuit Judge, and LEIBELL, District Judge.

LEIBELL, District Judge.

The Upjohn Company, a manufacturer and distributor of pharmaceutical products, instituted this action for unfair competition and for trademark infringement against David Schwartz, doing business as Bryant Pharmaceutical Company. Jurisdiction of the District Court over the unfair competition claims was based upon diversity of citizenship, and the Federal Trademark Statute, 15 U.S. C.A. § 1121, covered the other claims.

The complaint sets forth fifteen causes of action. Eight drug preparations of plaintiff and six registered trade-marks under which they were sold, are involved.[1] Two causes of action are pleaded as to each of the drug preparations sold under the six registered trademarks: one alleging unfair competition and the other trademark infringement. The remaining three causes of action are based upon unfair competition; one with respect to Ferrated Liver in tablet form; another, Ferrated Liver with Folic Acid,

| 1. | Name of plaintiff's drug preparation | Plaintiff's trade mark |
|----|--------------------------------------|------------------------|
| 1. | Unicap | 1. Unicap |
| 2. | Zymacap | 2. Zymacap |
| 3. | Cebefortis | 3. Cebefortis |
| 4. | Ferrated Liver (Capsule Form) | 4. Ferrated Liver |
| 5. | Ferrated Liver (Tablet Form) | . . . . . . . . . . . |
| 6. | Ferrated Liver (with Folic Acid) | . . . . . . . . . . . |
| 7. | Cheracol | 5. Cheracol |
| 8. | Kaopectate | 6. Kaopectate |

also in tablet form; and the last alleging a claim of unfair competition, collectively, as regards all of plaintiff's eight drug products.

Defendant's corresponding eight drug products are: (1) Capulets; (2) Brycaps; (3) Hi B & C; (4) Iron and Liver Capsules (Green); (5) Iron and Liver Tablets, Sugar coated Green; (6) Iron and Liver, with Folic Acid, Tablets, Sugar coated Red; (7) Syrocol; and (8) Neutrapect. A comparison of the physical appearance, size, shape and color of plaintiff's and defendant's respective products in capsule or tablet form shows a close similarity (except Unicap and Capulets) as the trial judge found.[2]

In each instance plaintiff had no monopoly of the formula used. It was generally known and any drug manufacturer could use it. Nor did plaintiff have any monopoly of a capsule or a tablet of a particular size, shape or color. They were functional features and could not acquire any secondary meaning. Essentially different drug preparations are put out in tablets or capsules of the same shape, size and color. The defendant could put up his drug preparations, using the same formula and even the same size and color for his capsules and tablets, if he took adequate precautions to prevent the substitution of his products for plaintiff's, a result that was likely to happen due to the close similarity of the two products, and if he did not resort to any deceitful practices.

The trial was held without a jury. The trial judge filed an opinion, in which he held for the defendant on all causes of action, except the eleventh which was for infringement of the trademark "Cheracol." As to that, the court found that [131 F.Supp. 655] "defendant's

---

2. *Unicap—Capulets:*—The drug formulas are not precisely the same. The amount of Vitamin D in Capulets is twice that of Unicap; the Folic Acid in Unicap is slightly higher. Unicap capsules are almost spherical, smaller, and of a lighter shade than the Capulets capsules which are ellipsoid, longer and of a darker brown. Substitution of Capulets for Unicap in filling a prescription would be difficult.

*Zymacap—Bryacaps:*—The formulas are the same. Capsules of each are almost the same size. The Bryacaps are a slightly darker red than the Zymacap. Both are very similar in appearance. Substitution of one for the other in filling a prescription would be easy.

*Cebefortis—Hi B & C:*—The formulas are not precisely the same, but the ingredients are and so is the dosage. Tablets of each are the same size; but Cebefortis tablets are a somewhat darker red than the Hi B & C tablets. In filling a prescription substitution of one for the other, without detection, would be possible.

*Ferrated Liver Capsules—Iron & Liver Capsules (Green):*—Formula contents of each are the same. Capsules of each look alike—are practically the same in color and in size. One could readily be substituted for the other in filling a prescription.

*Ferrated Liver Tablets—Iron & Liver Tablets (Sugar Coated Green):*—

The formulas are almost the same with the exception that plaintiff's tablets contain also Vitamin B–12 activity—2.0 mg. Defendant's Iron and Liver Tablets are slightly larger and a deeper green than plaintiff's tablets of Ferrated Liver. But in filling a prescription substitution would be possible.

*Ferrated Liver with Folic Acid, Tablets—Iron & Liver with Folic Acid, Tablet (Sugar Coated Red):*—Contents are the same, as the green above. Tablets of plaintiff and defendant are practically the same color red; however defendant's Iron and Liver (Folic Acid) tablets are slightly larger than the plaintiff's Ferrated Liver (Folic Acid) tablets. Substitution of one for the other in filling a prescription would be possible.

*Cheracol—Syrocol:*—Both are liquid cough medicines made from the same formula and each contains codeine. The medicines look alike and smell alike, and each tastes like cherry. There exists the possibility of substitution of one for the other in filling a prescription.

*Kaopectate—Neutrapect:*—Each contains Kaolin and Pectin, in the same ratio, according to Ex. 61. Each liquid is of the same color; and presumably would have the same taste. There is a possibility of substitution when sold on prescription.

trade-name Syrocol infringes plaintiff's registered trade-mark "Cheracol," holding that "while there are differences in spelling, the two marks are strikingly similar in sound." Accordingly judgment was rendered "permanently enjoining defendant from using the trade name Syrocol for its cough syrup," and dismissing all other claims of the plaintiff.

As to the nine causes of action alleging unfair competition, the court below found that none of plaintiff's products had acquired a secondary meaning; and that plaintiff had failed to show that the "make-up" of its products constituted a mark of distinction which identified their source as plaintiff. The court also found that the products of both plaintiff and defendant "though sometimes sold pursuant to a memorandum prescription," could, under the law, be dispensed without a prescription; that "there is no doubt that as between plaintiff and defendant plaintiff is the first comer, and that the similarity between plaintiff's and defendant's products is not a coincidence but the result of defendant's deliberate copying"; and that since "defendant has not offered any valid excuse for so imitating plaintiff's products," it follows that "his purpose could only be to benefit by the demand that plaintiff has created for such products." The trial court, however, refused to grant plaintiff any injunctive relief holding as a matter of law, that in the absence of a showing that plaintiff's products had acquired "secondary meaning," the defendant could not be found to have engaged in unfair competition because there was no proof that "there were instances of actual palming-off of defendant's products for plaintiff's products by defendant or others"; and that evidence of a suggestion made by a defendant's salesman to a druggist to whom defendant sold its products that defendant's products could be substituted for plaintiff's was not sufficient for injunctive relief.

Both plaintiff and defendant have appealed from the judgment below. Plaintiff contends that the court below erred in misconstruing the New York law applicable to the facts of this case, and in dismissing the claims for unfair competition.[3] Defendant on its cross-appeal contends that the court below was in error when it held that defendant's mark "Syrocol" infringes plaintiff's trademark "Cheracol." Defendant argues that the marks in issue are "unique and distinct and are not confusingly similar."

■ At the trial, defendant's deliberate copying of the drug ingredients and of the appearance of plaintiff's products was not challenged and many physical exhibits established that fact. The possibility of unauthorized substitution by druggists of defendant's products for plaintiff's products in filling prescriptions was equally apparent. There was also proof that defendant had cards printed (Exs. 16 and 62) listing its products, with a blank line alongside each, on which (Ex. 16) one of defendant's salesmen (Gottlieb) had written the name of plaintiff's corresponding products, which admittedly was an aid to a druggist in making substitutions; and that another salesman, Kass, had given another druggist a similar card (Ex. 62) for the purpose of making substitutions. Defendant's products were sold to druggists at half the price of plaintiff's products. The great difference in price would be an incentive to a druggist to substitute defendant's products for plaintiff's. On all the proof the plaintiff was entitled to some form of injunctive relief, to prevent the continuance of the unfair competition of the defendant, even though specific instances of palming-off in an actual sale by a druggist had not been shown. However, a sale by the manufacturer to a druggist, with the suggestion that the products sold could be substituted for a competitor's products, is itself a "type of palming-off." Defendant's in-

---

3. To the causes of action for unfair competition, where jurisdiction is based upon diversity of citizenship, this appellate court will apply the law of New York, the State in which the acts of unfair competition were committed. Artype, Incorporated v. Zappulla, 2 Cir., 1956, 228 F.2d 695, 697.

tent to compete unfairly and his use of deceitful practices had been shown.

The confusion of defendant's products with plaintiff's products was defendant's work. His purpose was to benefit from the favorable repute which plaintiff had established for its products. The possibility of substitution had been created by defendant. The suggestion of substitution had been made by defendant's agent. To require that in addition it must be shown that the druggists did what defendant had made it possible for them to do, and had even suggested that they do, and which was to their profit to do, before a court of equity will intervene, runs counter to the inherent power of the court of equity to prevent an intended fraud from reaching its full fruition. Martin H. Smith Co. v. American Pharmaceutical Co., 270 N.Y. 184, 200 N.E. 779, is a case involving suggested as well as actual substitution of drug preparations. The court there held 270 N.Y. at page 187, 200 N.E. at page 780: "There is also proof that defendants' selling agent wrote upon their printed price list 'Ergot-Apiol Capsules Similar Packages to Smith's' and delivered it to a druggist." The proof also indicated many instances of actual substitution of defendant's product for that of plaintiff. But the suggestion to the druggist of the possibility of substitution was a method of marketing adopted by the manufacturer that was itself unfair, since its purpose was to induce actual substitution by the druggist.

William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161, is a leading case, involving drug preparations and their substitutions. Justice Sutherland writing for a unanimous bench, stated 265 U.S. at pages 530–531, 44 S.Ct. at page 617:

"That no deception was practiced on the retail dealers, and that they knew exactly what they were getting is of no consequence. The wrong was in designedly enabling the dealers to palm off the preparation as that of the respondent. [Citing cases.] One who induces another to commit a fraud and furnishes the means of consummating it is equally guilty and liable for the injury."

In that case it fairly appeared "that petitioner's agents induced the substitution, either in direct terms or by suggestion or insinuation."

At the trial of the case at bar, it was developed that both the plaintiff and defendant sell their pharmaceutical products in bottles of various sizes. The small bottles, holding 50 or 100 capsules or tablets, are for direct over-the-counter sale by the druggist in the original package. Large bottles, containing 500 or 1,000 capsules or tablets, are used to supply the druggist with large quantities at somewhat lower prices and the druggist can draw on their contents in filling prescriptions or in repackaging for sale in small quantities without using any trademark or tradename for the product.

As the District Court found, there was no likelihood of confusion or deception possible when the sales of the respective products are made over-the-counter in the original packages of the manufacturer. The labels of the manufacturers and the names of the products are distinctive. And if druggists used their own containers in making over-the-counter sales of the products of either party, and placed their own labels thereon, which did not identify the manufacturer or bear the trademark or tradename of the product, that would not give rise to any claim of unfair competition by one manufacturer against another.

On this appeal we are mainly concerned with the so-called prescription trade which plaintiff contends constitutes an important segment of plaintiff's business. The evidence shows, as the court found, that plaintiff's advertising program is mainly directed to physicians and not to the lay public. Plaintiff advertises its products in all medical journals of nationwide circulation; by direct mail to physicians; and by having plaintiff's salesmen (a very large staff) make personal calls upon the physicians. This is done in order to acquaint the physi-

cians with the quality and type of plaintiff's products so that the physicians may prescribe plaintiff's products with confidence. Plaintiff's salesmen leave with the physician samples showing the size, color and shape of plaintiff's product, together with literature describing their contents and use. The trial judge found "that except in a few instances defendant did not advertise and distribute samples to doctors."

 There was evidence to the effect, and the court below so found, that some druggists or pharmacists do substitute pharmaceutical products of one drug manufacturer for those of another, where they look alike and the prices differ. But plaintiff was unable to prove that defendant's products were actually substituted by druggists for those of the plaintiff. The plaintiff tried to prove that to be the fact.[4]

On the issue of suggesting a palming-off, the record shows that defendant's salesmen, at least on two or three occasions, distributed printed cards [5] containing a list of defendant's products with a space alongside each on which there were filled in the names of similar products manufactured by The Upjohn Company.[6]

4. In attempting to prove actual "palming-off" of defendant's products as those of plaintiff's, plaintiff subpoenaed six witnesses, each of whom was a registered pharmacist and owned a drug store. While the attempt proved unsuccessful, it was not entirely due to any shortcomings of plaintiff's counsel. The first witness identified a certain prescription box as his own, bearing his prescription number and label thereon. He testified that the prescription called for Zymacap, but whether it was filled with Zymacap he was unable to state, the reason being that his clerk, and not he, had filled that prescription. The next witness identified a certain bottle as his, bearing his pharmacy label. He was asked whether he physically filled the bottle. The witness responded: "If it is what I put in there then I filled it." A colloquy between counsel and the court ensued.

Plaintiff's attorney then asked the witness whether it was his practice to fill prescriptions calling for Zymacap with Bryacaps. Before the witness could answer, the court remarked as follows:— "Now, before he answers that question I am going to advise him that there may be an answer which possibly might incriminate him. However, he may answer if he did anything like that. Did you do anything like that?" The witness replied: "Not knowingly, your Honor." The witness was thereafter excused.

The trial court's warning to the witness was warranted, but after it was given it could hardly be expected that any druggist witness would admit the substitution of a defendant's product for a plaintiff's product which had been prescribed by a physician. See N. Y. Penal Law McK.Consol.Laws, c. 40, § 1742, and the following cases which discuss that sec-

tion. Hewit Pharmacies, Inc., v. Aetna Life Ins. Co., 267 N.Y. 31, 35, 195 N.E. 673, 104 A.L.R. 1086; People v. Greenwald, 297 N.Y. 731, 77 N.E.2d 24.

The answer of the witness, that he had not "knowingly" substituted defendant's product "Bryacaps" for plaintiff's product "Zymacap" impliedly admitted that such a substitution was possible, because of the similarity of the two products in appearance and contents.

The third witness testified that he filled a certain prescription calling for Zymacap with Zymacap and nothing else. He was excused. The next witness admitted that the label on an exhibit which was handed to him was his label and that the bottle was similar to bottles he uses. However, he said he did not dispense the bottle and that he wasn't in the store when it was sold. He also was excused. The fifth witness identified a certain bottle and the label affixed thereto. However, he stated: "but the contents I wouldn't know." By virtue of that answer he was excused. The final witness admitted that a certain prescription was filled at his place of business, but stated that it was filled by one of his clerks and not by him. He admitted he purchased defendant's products. He was excused. Thus plaintiff failed to give direct proof of any instance of actual palming-off through those witnesses.

5. Only two of the cards are in evidence as exhibits. One (Ex. 16) was distributed by defendant's salesman Gottlieb on at least two occasions and the other (Ex. 62) was given by another salesman, Kass, to a Mr. Curasi, a pharmacist employed by the owner of a drug store.

6. On the card distributed by Mr. Gottlieb (Ex. 16) we find the defendant's products

Mr. Curasi testified that while employed by the Robert Paul Chemists Company he was retained by the plaintiff to do certain investigative work on its behalf. In the early part of 1952, acting on instructions, he wrote several letters to drug firms requesting copies of their trade catalogs under the pretense that he was in the market for certain drugs. One of the letters was sent to the defendant's company. Mr. Kass, a defendant's salesman, answering the inquiry, made a personal visit to the Robert Paul Chemists establishment. There Mr. Kass introduced himself to Mr. Curasi, as a salesman of defendant company, at which time Mr. Curasi, acting on instructions, purchased some of defendant's products. This course of dealing between Curasi and Kass continued over a period of several months. Mr. Kass did not display the card in question on his first visit, but he did on a subsequent visit, sometime in the month of February or March of 1952. Mr. Curasi testified that at that time Mr. Kass informed him that he could use defendant's products in place of other nationally known products, "because it is the same formula, the same taste, the same color, the same everything." Having seen the card, Mr. Curasi requested that Mr. Kass leave one with him. Mr. Kass promised to get him one. Repeated requests were made thereafter. On May 29, 1952, Mr. Kass complied with the request. Mr. Curasi testified that on that day Mr. Kass visited him, turned over the card to him, and stated: "Put it away some place, keep it out of sight." Defendant did not call Mr. Kass as a witness.[7]

printed in the left column and the plaintiff's corresponding products written out in longhand in the space provided to the right.

## HARD FILLED VITAMIN CAPSULES

| | |
|---|---|
| Iron and Liver Conc. (Green) | *Ferrated Liver* |

## SOFT GELATIN CAPSULES

| | |
|---|---|
| Bryacaps | *Zymacaps* |
| Capulets | *Unicaps* |

## VITAMIN TABLETS

| | |
|---|---|
| Hi-B and C | *Cebefortis* |
| Iron and Liver Con. (Green) | *Ferrated Liver* |
| Iron & Liver Con. with Folic Acid (Red) | *Ferrated Liver & Folic Acid* |

## SYRUPS

| | |
|---|---|
| Syrocol with Cod. | *Cheracol* |

## MISCELLANEOUS

| | |
|---|---|
| Neutrapect | *Kaopectate* |

The card distributed by Mr. Kass (Ex. 62) is the same as Ex. 16, except that alongside defendant's product "Capu'ets," the name of plaintiff's corresponding product "Unicap" does not appear, probably because their similarity in color and shape was not considered by Mr. Kass as sufficiently close to permit of substitution without danger of detection.

7. At the end of plaintiff's case, defendant's attorney after making a motion to dismiss because of a failure of proof, on which the court reserved decision, stated on the record:—"We believe that, frankly and sincerely, no case has been proven, and on that premise, although I have a number of witnesses, the defendant will rest on the case." As part of the record on appeal there has been included the deposition of Jack L. Kass. Whether such deposition was made part of the record before Judge Bondy we have no way of knowing. Assuming that it was, it contains nothing which directly refutes the statements made by Mr. Curasi as to the use of defendant's products for plaintiff's. Mr. Kass stated in his deposition that he told Curasi the substitution could be made with the prescribing physician's permission. Then why the card and why should it be kept out of sight?

Mr. Gottlieb testified however, that the card in question (Ex. 16) was used solely for price adjustment purposes. He claimed that of the 200 accounts he had serviced, a few accounts were buying more cheaply from other concerns, and in order to retain their business he had to meet that competition by allowing those accounts sometimes 50 cents off on one item, 25 cents on another, and therefore he would record these special prices on the cards alongside the items so purchased. He further testified that he possessed only six or eight such cards which he destroyed, when he found that they could be used as guides for substitution.

As noted previously the court below did not make any findings concerning this testimony other than that it did not "establish that there was any actual palming-off of defendant's products for plaintiff's products by the defendant, pharmacists or anyone else."

 The court is of the opinion that the record herein supports the conclusion that the cards in question when distributed to druggists and pharmacists were to be used as guides for substitution and that defendant intended such use.[8] The explanation of "price adjustment purposes" offered by Mr. Gottlieb is not sufficient to overcome the very damaging notations contained in both exhibits before this court. Furthermore, his explanation is inconsistent with the court's finding that "when he [Gottlieb] found that they [the cards] could be used as guides for substitution" he destroyed all of them. If the sole purpose of the cards was to record special prices granted on certain accounts there was no need to write thereon the names of plaintiff's similar products and there was no need for their later destruction.

 In Zangerle & Peterson Co. v. Venice Furn. Novelty Mfg. Co., 7 Cir., 1943, 133 F.2d 266, 269, Judge Minton expressed a rule of unfair competition which is applicable to the facts of the case at bar. The law permits the copying of an article of merchandise that is not covered by a valid patent, if the copying party "does not represent the copies as the product of the party making the original and does nothing in the merchandising of the goods to induce [his] customers to engage in 'palming off' or to indicate to them how they may 'palm off' the copy as the product of the original maker." The defendant in the case at bar could copy the plaintiff's pharmaceutical products, but he was not permitted to indicate to a customer, as defendant's salesman Kass did, how the defendant's products could be used in filling prescriptions or requests for plaintiff's corresponding products, because of their similarity in appearance and contents. Exhibits 16 and 62 served that purpose.

In Smith, Kline & French Lab. v. Clark & Clark, 157 F.2d 725, 731, the Third Circuit held that defendant's copying of certain distinctive features of plaintiff's tablets would not of itself constitute unfair trade practice. But that there was a "type of palming off" when the "feasibility of substituting [defendant's tablets for plaintiff's]" without danger of detection "was brought to the mind of the druggist by the defendants' salesman pointing out the identity of the two preparations and the enhanced profit to be made by selling the former in lieu of the latter." That constituted unfair competition.

 An unfair course of dealing, even without proof of an established secondary meaning, constitutes unfair competition. The New York law of unfair competition has been broadened. Flint v. Oleet Jewelry Manufacturing Co., D.C., 133 F.Supp. 459, 464, cited with approval in Joshua Meier Co. v. Albany Novelty Mfg. Co., 2 Cir., 236 F.2d 144, 148.

In Santa's Workshop v. Sterling, 282 App.Div. 328, 122 N.Y.S.2d 488, 489, the

---

8. An appellate court is in as good a position as a trial judge to interpret documentary evidence. Kind v. Clark, 2 Cir., 161 F.2d 36, 46; Chas. D. Briddell, Inc., v. Alglobe Trading Corp., 2 Cir., 194 F.2d 416, 420; and Iravani Mottaghi v. Barkey Importing Co., 2 Cir., 1957, 244 F.2d 238.

Appellate Division, 3rd Department (July 1953) held that "The law of unfair competition no longer requires that plaintiff's business and advertising shall have acquired a 'secondary meaning.'" "The controlling question in all cases where *the equity power of the courts is invoked is whether the acts are fair or unfair, according to principles recognized in equity.'"* Deceitful practices and fraudulent acts in pushing a product in competition with the owner of a similar product constitutes unfair competition. "In ordinary commercial affairs, 'substitution by deception' is wrongful, but, when in the healing art there is 'substitution by deception,' greed may *reach the grade of malice."* Winthrop Chemical Co. v. Weinberg, 3 Cir., 60 F. 2d 461, 463.

■ As stated in William R. Warner & Co. v. Eli Lilly & Co., supra, 265 U.S. 526, at page 531, 44 S.Ct. 615, at page 617: "The charge of unfair competition being established, it follows that equity will afford relief by injunction to prevent such unfair competition for the future"; and Judge Learned Hand stated in Artype, Incorporated v. Zappulla, supra, 2 Cir., 228 F.2d 695, at page 698: "As always, a court of equity will shape the remedy so as to do as little injury to the defendant as is necessary in order to insure adequate protection to the plaintiff." [9]

David Schwartz no longer does business under the name of Bryant Pharmaceutical Company. But he is the manager and a stockholder of a successor corporation, engaged in the same business. The situation can be satisfactorily met by issuing an injunction against him personally. David Schwartz should be enjoined from either directly or indirectly, representing or suggesting to any one selling any pharmaceutical products similar in contents and appearance to plaintiff's products that such similar products may be substituted for the products of the plaintiff when the latter

are prescribed or requested by a physician; and that on the sale of any such products he be required to attach to bottles or containers of a size not made for direct over-the-counter sale, a notice that the contents are not to be sold or dispensed as the product of the plaintiff. William R. Warner & Co. v. Eli Lilly & Co., supra, 265 U.S. 526, 532–533, 44 S. Ct. 615.

■ The final question to be decided is whether the court below was correct when it enjoined defendant's use of his tradename "Syrocol" because it infringed plaintiff's registered trademark "Cheracol." We hold it was not. The two words do not look or sound enough alike to justify a holding of trademark infringement. The only similarity is in the last syllable, and that is not uncommon in the names given drug compounds. It cannot be said that the tradename "Syrocol" adopted by the defendant in the sale of his cough medicine is so similar to plaintiff's registered trademark "Cheracol" as to be likely to cause confusion among reasonably careful purchasers. LaTouraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115, 117, certiorari denied 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663. The close similarity exists only in the ingredients of each and in the fact that both constitute cough medicine preparations, look alike and taste alike.

The judgment of the trial court is reversed on the unfair competition claims and the case is remanded for the issuance of an appropriate injunction against the defendant, David Schwartz, in accordance with this opinion. The judgment is also reversed insofar as it held that plaintiff's trademark "Cheracol" was infringed by defendant's use of the name "Syrocol." The judgment is affirmed insofar as it held that the other trademarks of plaintiff had not been infringed. The costs and disbursements on this appeal shall be borne in equal amounts by the respective parties.

9. However, unlike the Artype case, supra, the record before us is not too meager to allow us to frame a proper judgment. The converse is true.