**FLEXITIZED, INC. and Flexitized Sales Corporation, Plaintiffs,**

v.

**NATIONAL FLEXITIZED CORPORA-TION and Dubin-Haskell Lining Corp., Defendants.**

United States District Court
S. D. New York.
Feb. 19, 1963.

Hahn, Hessen, Margolis & Ryan, New York City, Robert J. Clerkin, New York City, of counsel, for plaintiffs.

Deane Ramey, New York City, for defendants.

TYLER, District Judge.

This action was tried before this court and a jury on January 9, 10, 11 and 14 through 18, 1963. Plaintiffs' complaint alleges three claims: breach of contract, trade-mark infringement, and unfair competition. In their prayer for relief plaintiffs seek money-damages on all three claims and an order enjoining defendants from unauthorized use of the trade name "Flexitized".

Jurisdiction of this court has been invoked by virtue of certain claims "arising under the laws of the United States" (28 U.S.C. § 1338) and on the basis of diversity of citizenship of the parties. (28 U.S.C. § 1332).

■ With consent of the parties, the issues of liability for trade-mark infringement and unfair competition, resultant damages, if any, in the trade-mark infringement and unfair competition claims, along with the question of injunctive relief, were submitted to the court.[1] The issues of liability for breach of contract, as well as of damages, if any, for breach of contract, were to be decided by the jury.[2]

1. Similarly, of course, defendants' alleged counterclaims relating to plaintiffs' trademark were reserved for the court to decide. In substance, defendants' counterclaims are for "declaratory judgment of non-infringement", for cancellation of the mark and for damages based upon allegations that the mark was fraudulently procured.

2. Prior to trial, plaintiffs had asserted, at least formalistically, a demand for a jury trial on all three of their claims.

The product of the jury's deliberations in this case is in the form of answers to twenty-four written questions propounded by the court and submitted to the jury. These questions, and the answers to them, serve a dual function. With respect to the issues to be determined by the jury, the answers constitute the special verdict provided by F.R.Civ.P., Rule 49(a). With respect to the issues to be decided by the court, the answers are advisory only. F.R.C.P., Rule 39(c).[3]

By consent of the parties, judgment in all branches of the case was to abide the event of this opinion, which, accordingly, combines declaration of judgment under Rules 49(a) and 58, with the disposition, including findings of fact and conclusions of law, of the issues submitted to the court (F.R.C.P., Rules 39(a), 52(a)).

The following facts were established at trial.

Mr. Louis Graver, president of both plaintiff corporations, was for some time prior to 1953 engaged in various capacities in the manufacture and sale of textiles and related items. In the year 1953 Graver became attracted to the idea of developing a flexible garment "stay" which, when sewn into a portion of a garment, such as a shirt collar, would have the capacity of retaining a particular configuration or style to which the wearer could shape it.

Mr. Graver, together with others who were to become the principals of both plaintiff companies, developed such a product in 1953. In July or August of that year they coined the word "Flexitized" and on September 17, 1953, plaintiff Flexitized, Inc. as the manufacturer, and plaintiff Flexitized Sales Corp., as the sales agency, were organized under the laws of California.

Shortly thereafter, Alpha Dye Cutting and Manufacturing Co., a California corporation, became the plaintiffs' distributors for the West Coast area.

Late in 1953 there were conversations between Mr. Graver and representatives of defendant Dubin-Haskell Lining Corp. ("Dubin-Haskell") concerning the possibility of Dubin-Haskell or an affiliated company becoming plaintiffs' distributing agent, purchasing stays for resale to garment manufacturers in the area of the United States east of the Rocky Mountains. These conversations led to an exchange of letters between the parties.

The first of these, dated December 4, 1953, is from Graver to Mr. Herbert Haskell of Dubin-Haskell, and sets forth the "major" terms of an "agreement" reached "pursuant to our today's conversation" [by telephone]. There followed a reply letter, dated December 8, 1953, from Haskell to Graver which, referring to the "contractual agreement of December 4", suggests certain modifications of the terms stated in the December 4 letter.

The letter of December 8 states in part:

"As we both thought, it would be a good idea to get your attorney to write up an agreement covering all these points as we agreed and forward same to us to make this legally official. In the meantime, as per your statement, we will proceed and start working on this product immediately."

No such formal written agreement was ever prepared or adopted by the parties. The letters do not, nor do they purport to, incorporate all the terms of the agreement reached by the parties. It is clear that the parties agreed that Dubin-Haskell, or an affiliated company, was to become the plaintiffs' exclusive distributor throughout the United States, with the exception of the eleven Western states; that the contract was to run for five years; and that "Dubin-Haskell would not have the right to sell a competing product, directly or indirectly (for the life of this contract)".

---

3. American Lumbermens Mut. Cas. Co. of Illinois v. Timms & Howard, 108 F.2d 497, 500 (2d Cir., 1939).

Under date of December 17, 1953, Jesse Blattel, counsel acting on behalf of the plaintiffs, wrote to Mr. Haskell as follows:

"I am presently in the process of drawing a proposed agreement following generally along the lines outlined in your correspondence with Mr. Graver. He informs me that you intend to form a corporation which will incorporate the name 'Flexitized'. I would like to know something about the manner in which the corporation is to be set up, including capitalization and stock ownership. I have suggested to Mr. Graver that the use of the name 'Flexitized' in the proposed corporation be conditioned upon the faithful performance of the proposed agreement and that the corporation would agree to change its name in the event it no longer handled Flexitized stays.

"If either you or your attorneys have any suggestions regarding the proposed agreement, I would greatly appreciate your transmitting them to me."

It does not appear that defendants responded to this letter or to the points raised in it. Specifically, there appears to be no other writing relating to the terms under which Dubin-Haskell would organize its sales agency as distributor for plaintiffs' stays.

Defendant National Flexitized Corp. ("National Flexitized") was organized by Dubin-Haskell in the early part of 1954 as distributor for the plaintiffs' product. During the years 1954, 1955, and 1956, National Flexitized purchased, for resale to garment manufacturers, plaintiffs' stays in dollar volume in excess of $100,000 per annum.[4]

The trade-mark "Flexitized", Registration No. 601,713, was registered by the United States Patent Office on February 1, 1955 in the name of Flexitized, Inc. and such registration is still in effect. Earlier, the plaintiffs had applied for, but were not successful in securing, a patent on their "Flexitized" stay.

Sales by National Flexitized of the plaintiffs' stays fell off markedly in the latter part of 1956 and early part of 1957. The reason for this is, in part, disputed.

Defendants maintain that the sole cause was the entry onto the market of a stay made of a material called "mylar" which, though it did not have the property of being shapeable by the wearer, nonetheless was priced substantially below the plaintiffs' stay and was highly competitive with it.

During a substantial portion of 1956 and 1957 defendant National Flexitized, unbeknownst to plaintiffs, was selling stays, including the mylar stay, which were not made or sold by plaintiffs.

In a letter dated April 8, 1957, from Mr. Henry Amber of Flexitized Sales Corp., to Mr. Haskell, Mr. Amber stated:

"We are going to attempt to sell the product by other means. * * * I am sure you will understand as you were doing absolutely nothing with it and we cannot afford to have it be idle. We will of course, not leave you out on any limb and if in the next thirty days you have any requirements that need to be taken care of we will continue to service you for that period."

On July 16, 1957, Mr. Graver wrote as follows to Mr. Haskell:

"We have evidence to the effect that you are handling a competitive stay, which is in direct violation of our arrangement. Therefore, we have decided to terminate relations with National Flexitized Corpora-

---

4. Sales by plaintiffs to National Flexitized were as follows:
 Jan. 1, 1954–Aug. 31, 1954: $ 77,000.
 Sept. 1, 1954–Aug. 31, 1955: $130,057.
 Sept. 1, 1956–Aug. 31, 1956: $143,388.
 Sept. 1, 1956–Aug. 31, 1957: $ 39,278.

Sales by the plaintiffs to Alpha Dye Cutting and Manufacturing Co. were, for the same four periods respectively: $11,160; $23,127; $25,824; $40,524.

tion, the same to take effect immediately. We will, however, fill any emergency orders up until August 1, 1957.

"Furthermore, we request that you immediately discontinue using the name 'Flexitized' in your operations, as we have learned that you are selling other products under this name."

Plaintiffs transferred their business from the defendants to the Eagle Neckband Corp., a New York corporation.

During the life or the distributorship agreement between plaintiffs and defendants, the word "Flexitized" was used in advertising material paid for by defendants as well as by plaintiffs. This material included brochures, advertisements both in trade publications and in magazines of general circulation, and "hang tags" which were attached to garments containing the stays. Some of the advertising material was prepared by plaintiffs and forwarded to defendants for use by them.

Since the termination of this agreement, defendants have continued to use the word "Flexitized", both in the corporate name of defendant National Flexitized, and in connection with the marketing and distribution of stays not made or sold by plaintiffs.

## THE BREACH OF CONTRACT CLAIM

■ On the claim for breach of contract, the jury expressly found: (a) that there was a contract between both plaintiffs on the one side and both defendants on the other;[5] (b) that this contract provided that the defendants, as sales

agents or distributors of the plaintiffs, undertook (i) not to sell competing products through defendant National Flexitized during the life of the contract and (ii) to use best efforts to sell plaintiffs' stays during the life of the contract; (c) that both these contractual provisions were breached by both defendants; (d) that these breaches caused the plaintiffs injury and resultant damages in the amount of $27,000; and (e) that the plaintiffs did not fail to take measures reasonably available to mitigate the injury caused by these breaches.

Since there was adequate evidence to support each of these findings of fact made by the jury,[6] it is my duty to declare judgment, under F.R.C.P., Rule 58, in favor of both plaintiffs and against both defendants jointly and severally in the amount of $27,000 on the claim for breach of contract.

## THE CLAIM OF TRADE-MARK INFRINGEMENT AND DEFENDANTS' RELATED COUNTERCLAIMS

Turning next to the claim of trademark infringement, defendants' first contention is that the mark "Flexitized" is "merely descriptive" within the meaning of 15 U.S.C. § 1052(e) (1) and therefore not a valid mark. Defendants seek a declaratory judgment of such invalidity and the entry of an appropriate order under 15 U.S.C. § 1119.

■ The registration of a trademark is *prima facie* evidence of its validity (15 U.S.C. § 1115(1) (a) ), but a mark which, as applied to the goods

---

5. Since the defendants' obligations under this contract were performed chiefly by defendant National Flexitized, the jury was asked whether there were present the factual elements which, supposing that defendant Dubin-Haskell was an original contracting party, would give rise to the finding that there had been a novation in consequence of which Dubin-Haskell had ceased to be a contracting party. The answers of the jury to these questions negatived this possibility. (Questions 3, 4.)

6. As to the amount of damages, there was evidence from which the jury could conclude that, (a) at the time the contract was terminated in consequence of the defendants breach, it had at least 15 and perhaps as many as 20 months still to run, (b) a profit of approximately $39,-000 would have accrued to plaintiffs but for the breach of contract, and (c) the plaintiffs were able to recoup a portion of these lost profits through sales to a distributor retained, after the breach, in the stead of defendants.

of the applicant, is "merely descriptive" should be denied registration. 15 U.S.C. § 1052(e) (1).

■ If a trade-mark describes the qualities, ingredients or characteristics of the product to which it is attached, it is descriptive. Estate of P. D. Beckwith, Inc. v. Commissioner of Patents, 252 U.S. 538, 543, 40 S.Ct. 414, 64 L. Ed. 705 (1920).

Arguably, since the question must turn upon a realistic appraisal of the individual mark and the goods to which it is applied, prior decisions may not be of great value in deciding the issue whether a given mark is descriptive.

Nevertheless, a mark somewhat analagous to the one at bar was litigated in Standard Paint Co. v. Trinidad Asphalt Mfg. Co., 220 U.S. 446, 455, 31 S. Ct. 456, 55 L.Ed. 536 (1911). The Supreme Court found that, as applied to the goods in question, a type of roofing material, the mark "ruberoid" simply meant "like rubber" and held that the mark was invalid as being descriptive.

■ It may be noted that it is of no consequence that plaintiffs coined the word, for even if the word does not appear in the accepted dictionaries, the latter fact, standing alone, does not prove that the word is not descriptive.[7]

■ "Flexitized", obviously, is in significant part a combination of the prefix "flex" and the suffix "ize". Webster's Third New International Dictionary (Unabridged; 1961) defines the word "flex" as "to bend". It defines the root "ize" as a suffix which gives to verbs the sense " * * * to cause to have or appear to have some (specified)

quality * * * ". The coined word "Flexitized" is a description, in condensed form, of the outstanding characteristic of the flexible collar stays made or sold by plaintiffs.[8]

This court holds, therefore, that the word "Flexitized" is, as applied to the goods in question, "merely descriptive" and thus not a valid mark.

In this view of the matter, it is unnecessary to pass upon the other defenses and counterclaims by defendants to the claim of trade-mark infringement, which, in any event, are, in the opinion of the writer, largely insubstantial.

## UNFAIR COMPETITION CLAIM

### (A) *The Question of the Applicable Law*

Turning to plaintiffs' claim of unfair competition, there is at the threshold of this subject the question of what law governs a claim for unfair competition where, as in this case, it is coupled with a substantial and related claim of trade-mark infringement, under 28 U.S. C. § 1338(b) and there is also diversity of citizenship between the parties.[9]

The Court of Appeals of this Circuit has adverted to this question, but has expressly declined to give a definitive answer to it, on the grounds that the controversies before it rendered the choice of law problem largely, if not entirely, theoretical. Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614, 619 n. 9 (2d Cir., 1962); Maternally Yours, Inc. v. Your Maternity Shop, 234 F.2d 538 (2d Cir., 1956). This course does not commend itself here since this court concludes that upon the

---

7. Franklin Knitting Mills, Inc. v. Fashionit Sweater Mills, Inc., 297 F. 247 (S.D.N.Y. 1923), aff'd 4 F.2d 1018 (2d Cir., 1925) ("Fashionknit" as applied to knitted clothing).

8. Plaintiffs argue that the distinctive quality of the collar stays to which the word "Flexitized" was, at least originally, applied, is their capacity to retain the shape the wearer chooses to give them. But the word "flex" may give this connotation

as well, as is illustrated in one meaning of the word "flexible", which is "willing or ready to yield to the influence of others: tractable, manageable * * * ".

9. Despite several invitations to do so by this court, counsel for the parties here were reluctant to take a firm position, with stated reasons therefor, on this question. However, defense counsel finally did indicate in general terms his view that "federal law" is controlling.

facts at bar the choice of law question is of more than academic interest.[10]

It has been suggested that federal law should govern a claim of unfair competition, at least when joined with a claim for trade-mark infringement. Maternally Yours, Inc. v. Your Maternity Shop, 234 F.2d 538, 545–547 (2d Cir., 1956) (concurring opinion). The phrase, "indeterminate general law", Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614, 619 n. 9 (2d Cir., 1962) has also been suggested as the law which should control in such cases. (This latter phrase may be meant to denote federal law, or, perhaps, a constitutionally undifferentiated composite of both state and federal law. Ibid.)

There is much to be said for applying a potentially uniform federal law of unfair competition, at least where multi-state activity is involved. In addition to the conceptual and practical difficulties of such a doctrine,[11] however, there is the fact that "* * * The prevailing view subsequent to Erie [Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)] has been that federal law governed infringement of federally-registered trade-marks, while state law governed common-law unfair competition. * * * [Citations, largely omitted, include Pecheur Lozenge Co., Inc. v. National Candy Co., Inc., 315 U.S. 666, 62 S.Ct. 853, 86 L. Ed. 1103 (1942); see also, Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 468, 61 S.Ct. 703, 85 L.Ed. 949 (1941).]" Maternally Yours, supra, 234 F.2d p. 540 n. 1.

More important than the weight of precedent,

> "* * * [I]t is the *source* of the right sued upon, and not the ground on which federal jurisdiction over the case is founded, which determines the governing law. * * * Thus, the Erie doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law." Maternally Yours, supra, pp. 540–541, n. 1.

The Court of Appeals of this Circuit has held, and its conclusion does not seem assailable, that there is no federally created cause of action for unfair competition. American Automobile Association v. Spiegel, 205 F.2d 771 (2d Cir., 1953), cert. den. 346 U.S. 887, 74 S.Ct. 138, 98 L.Ed. 391 (1953) (but cf., Judge Clark's concurring opinion in Maternally Yours, supra, 234 F.2d pp. 546–547.)

[redacted] Although defendants are New York corporations and, so far as appears from the record, have their principal place of business in New York, their claimed acts of unfair competition took place, or were "completed", in many other states as well.[12] But the courts of New York do not, in multi-state unfair competition cases, apply conflicts of law principles to make controlling the law of the individual states where each tort took place. Eg., Keasbey v. Brooklyn

10. See note 21 post.

11. The question is often put as involving a "choice" of law. But the initial and most serious question, of course, is not one of "choice" but whether a federal law of unfair competition in fact exists. The second question is, in what type of case and in what courts may, or must, such a law be applied.

If the touch-stone for the applicability of a federal law of unfair competition is joinder with a claim of infringement under 28 U.S.C. § 1338(b), such a federal law would encompass cases not necessarily involving inter-state acts of unfair competition, and would exclude from its scope unfair competition with respect to unregistered or common law trade-marks. Moreover, again positing the existence of a federal law of unfair competition, there would arise the further question whether it is to replace or, in the alternative, to be conjunctive with, rights afforded by state laws of unfair competition, as, for instance, in cases where the latter were more liberal or inclusive.

12. Restatement of the Law of Conflict of Laws, § 377 (1934) (Tort takes place where the completing event, normally the injury, occurs.)

Chemical Works, 142 N.Y. 467, 37 N.E. 476 (1894).[13]

The court concludes that the law controlling the claim of unfair competition in the case at bar is the common law of unfair competition, as that law is applied and interpreted by the courts of New York. Cf., National Fruit Product Co., Inc. v. Dwinell-Wright Co., 47 F.Supp. 499, 505 (D.C.Mass.1942) ("local common law"),[14] aff'd. 140 F.2d 618 (1st Cir., 1944).

### (B) The Issue and Proofs of Unfair Competition

As heretofore indicated, the basic factual questions on which the issue of unfair competition turns were submitted to and answered by the jury. Two theories or types of unfair competition are implicit in the questions put to the jury on this subject. These two theories can best be elucidated by setting forth here the questions propounded with respect to each:

(1) *First type of unfair competition:*

Question #18. "If defendant National Flexitized used the word 'Flexitized' in connection with stays not made or sold by plaintiffs, did a significant number of purchasers of stays or garments containing such items buy such stays or garments because of a mistaken belief that the stays were made or sold by plaintiffs?" [Answer: "Yes".]

(2) *Second type of unfair competition:*

Question #13. "Did a significantly large number of purchasers of collar stays or garments containing such items become familiar with the word 'Flexitized' *before* defendant National Flexitized started selling stays made or sold by companies other than plaintiffs?" [Answer: "Yes".]

Question #14. "If the answer to #13 is yes, did this familiarity make these purchasers more likely to buy stays or garments containing such items called 'Flexitized' because the word 'Flexitized' was used in connection with them?" [Answer: "Yes".]

Question #15. "If the answer to #14 is yes, did defendant National Flexitized use, without permission, the word 'Flexitized' in connection with stays not made or sold by plaintiffs with the deliberate intention of exploiting the purchasers' familiarity with the word 'Flexitized'?" [Answer: "Yes".]

The first-stated type of unfair competition is, of course, the familiar category commonly referred to as "palming-off". The gravamen here is inducing purchasers to buy because of a mistaken belief as to the source of the goods. Cf., Lucien Lelong, Inc. v. Lander Co., 164 F.2d 395, 397 (2d Cir., 1947).

Though the point is not frequently articulated, the palming off theory of unfair competition often extends

---

13. Even supposing that, notwithstanding Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941), the federal courts were free to apply their own conflicts of law rule in these cases, there would be little to recommend applying the law of many different jurisdictions in one case.

With respect to the constitutionality of New York courts applying New York law to extra-state torts, it is sufficient, at least, that there is a unitary pattern of unfair competition and that the acts of unfair competition "were at least initiated in this State and in some instances were completely performed here" (Swanson Mfg. Co. v. Feinberg-Henry Mfg. Co., 54 F.Supp. 805, 813 (S.D.N.Y.1943), modified 147 F.2d 500 (2d Cir., 1945)).

14. National Fruit, supra, 47 F.Supp. at pp. 502–505, contains an exemplary discussion by Wyzanski, J., of the full range of issues raised by the conflicts problem in unfair competition cases. A subsequent case in the same District repudiated Judge Wyzanski's holding that the "local common law" governs, and found that federal law governed the claim of unfair competition asserted. Bulova Watch Co., Inc. v. Stolzberg, 69 F.Supp. 543 (D.C. Mass.1947). However unexceptionable the statement in Bulova, p. 546, that " * * * there is a strong policy in favor of interstate uniformity in the field of unfair competition", it is questionable whether this, standing alone, justified the conclusion that there is a federal law of unfair competition.

further to cover those cases where, at least arguably, the reality is less source-confusion than product-confusion.[15]

■ Both these branches of the palming-off rule are alike in one critical respect. Both are directed to the purchaser's conscious and rational choice between products, based on certain facts, and the thrust of each is to forbid interference with the exercise of this choice by deception. The source-confusion branch of the palming-off rule forbids deceiving the purchaser as to the source of the goods; the product-confusion branch of the rule forbids deceiving the purchaser as to the identity of the goods, whatever aspect of such identity may be of chief significance to the purchaser.

■ The jury, in answer to a special question (#18) submitted to it by this court, found that there was such "traditional" palming-off in the case at bar, Notwithstanding this finding, the court, upon review of the evidence, finds little or no proof that a substantial number of purchasers were induced to buy because of mistaken belief as to either the source or the nature of the stay being purchased.[16] Hence, it is concluded that as a matter of law plaintiffs have failed to prove "secondary meaning" of their mark or traditional confusion of source or identity of the goods as caused by acts and practices of defendants.

The theory underlying the type of unfair competition delineated as the "second type" (Questions 13–15), above, gives rise to more difficult problems and leads to different findings and conclusions. This concept, which shall be referred to here as "free ride" unfair competition, lays measurably less stress on the trade-mark as a symbol standing for a specified source or specified qualities in the mind of the purchaser. Indeed, free-ride unfair competition may exist where buyers have not, in any meaningful sense, been "deceived".

■ Rather, "free-ride" unfair competition emphasizes the element of wrongful expropriation, in the use by one of the value, rightfully belonging to another, which is inherent in purchaser familiarity with a trade-mark, trade name, package design, or similar advertising symbol.[17]

This expropriation of the good will of a trade-mark or other symbol is, to be sure, normally one element in "palming-off" unfair competition. But what is suggested here is that the expropriation should, in appropriate circumstances,[18] be recognized as a self-sufficient ground for an action in unfair competition.

The legitimacy of deeming expropriation to be an independent basis for unfair competition in the field of trade names is grounded on the following ob-

15. A major reason why this extension is not always articulated is that unfair competition, in the area of trade-marks, is assumed to have essentially the same principles as trade-mark infringement, Speed Products Co., Inc. v. Tinnerman Products, Inc., 179 F.2d 778, 781 (2d Cir. 1949), and the Lanham Act refers only to "confusion * * * as to the source of origin". 15 U.S.C. § 1114(1) (a). This has led to continued use of this verbal formula in cases where the "origin" of goods may be unknown or of little significance to the purchaser. See, for example, Feathercombs, Inc. v. Solo Products Corp., 306 F.2d 251 (2d Cir., 1962) cert. den. 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962) (hair combs); Hygienic Specialties Co. v. H. G. Salz-man, Inc., 302 F.2d 614 (2d Cir., 1962) (soap dishes).

16. Indeed, Jerome White, the only one of plaintiffs' witnesses who was directly asked to give evidence on these fact issues, testified rather categorically that in making purchases of flexitized stays, he neither knew nor cared about the source or precise identity of the goods.

17. Specifically, the injury may be caused by diluting the trade name, by tarnishing it through association with inferior goods or services, or where the second-comer is a competitor, by diverting trade from the first-comer.

18. The numerous factors which determine, in any given case of unfair competition, what relief, if any, should be granted, are outlined post, § 19ff.

servation. It cannot be doubted that the buying public tends to favor a product whose name or package design has become familiar through advertising or by other means, rather than one whose name and package design are totally unknown.

This effect rests minimally on the sources and the qualities of the competing products, to which the palming-off theory is restricted. Indeed, the qualities of the competing products may be either nearly identical, or else unknown; and the supposed virtues of the competing manufacturers may likewise be unknown or of little actual significance in the purchaser's choice. In such cases, the cachet or familiarity of a trade name may well be the one dominant factor in the purchaser's choice.

■ The articulation of "free-ride" as an independent theory of unfair competition in the area of trade name protection, is, in the opinion of the writer, countenanced by the interpretation which the New York courts have given to the common law of unfair competition.

In a case involving the pirating of dress designs, Dior v. Milton, 9 Misc.2d 425, 155 N.Y.S.2d 443 (S.Ct., N.Y.Co., 1956) (Greenberg, J.) aff'd. 2 A.D.2d 878, 156 N.Y.S.2d 996 (1st Dept. 1956) it was stated, in the course of an excellent discussion of the law of unfair competition that:

"With the passage of those simple and halcyon days, when the chief business malpractice was 'palming off', and with the development of more complex business relationships and, unfortunately, malpractices, many courts, including the courts of this State, extended the doctrine of unfair competition beyond the cases of 'palming off'. The extension resulted in the granting of relief in cases where there was no fraud on the public, but only a misappropriation for the commercial advantage of one person of a benefit or 'property right' belonging to another." Id. p. 452.

A similar view, with respect to different fact situations, is manifested in other cases as well. Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 567–568, 190 N.Y.S.2d 977, 161 N.E.2d 197 (1959); Playland Holding Corp. v. Playland Center, Inc., 1 N.Y.2d 300, 152 N.Y.S.2d 462, 135 N.E.2d 202 (1956); Vaudable v. Montmartre, Inc., 20 Misc. 2d 757, 193 N.Y.S.2d 332, 335 (S.Ct., N.Y.Co., 1959) (Greenberg, J.) ("A wrongful attempt to suggest an association or connection of some sort is sufficient to warrant relief to prevent confusion in the public mind as well as dilution of plaintiffs' trade name."); Pharmaceuticals, Inc. v. United Whelan Corp., 22 Misc.2d 532, 197 N.Y.S.2d 22, 24 (S.Ct., N.Y.Co., 1959).

This view, since it is grounded upon a theory of tortious misappropriation, places great emphasis upon, if it does not make a requirement of, wrongful intent:

"Equity will, therefore, enjoin as unfair competition the adoption or use of the trade name, trade-mark or advertising of another, where the apparent purpose is to reap where one has not sown, or to gather where one has not planted, or to build upon, or profit from, the name, reputation, good will or work of another * * *". Harvey Machine Co. v. Harvey Aluminum Corp., 9 Misc.2d 1078, 175 N.Y.S.2d 288, at p. 291 (S.Ct., N.Y.Co., 1957). See, also, Mainzer, Inc. v. Gruberth, 237 App.Div. 89, 93, 260 N.Y.S. 694 (1st Dept. 1932), aff'd. 262 N.Y. 484, 188 N.E. 30 (1933); Vaudable v. Montmartre, Inc., supra, 193 N.Y.S. 2d at p. 335.

■ In these cases the New York courts have minimized, if not eliminated, the requirement that plaintiff show that the mark for which he seeks protection has acquired a "secondary mean-

ing" such that it has come to "stand for" the plaintiffs' business.[19]

Where the gravamen is unfair or wrongful misappropriation of the value represented by public familiarity with the trade name or mark itself, then such secondary meaning, like the element of public deception, ceases to be a prerequisite for the cause of action.[20]

It is important to observe that the New York courts, in applying the misappropriation rationale to trade name cases, for the most part have granted relief only to the extent of enjoining the offending conduct. This in part may be ascribed to the difficulty of computing money-damages in such situations. Of more significance, it also may be attributable, in part, to the central role which traditionally equitable factors play in extending protection to interests not strictly classifiable as "property rights".[21]

This court concludes, therefore, that the jury's findings, particularly in answer to Questions 13, 14 and 15, which the court "finds" and adopts as being amply supported by the evidence, establish that defendants unfairly and wrongfully enjoyed a "free ride" with the word "Flexitized" in connection with their sales and business operations.

The law of unfair competition, however, must be applied flexibly, and whether relief should be granted in a given instance must be determined by an appraisal of the particular circumstances of the case.

Of the many factors relevant to such an appraisal, there are perhaps three of general applicability.

First, there is a legitimate public interest in refusing to grant to one individual or business a monopoly right in the use of a word which has become generic and which is, accordingly, the only word by which a given commodity is known.[22] Second, where the design of the product itself is the identifying mark, rather than a trade

19. Sullivan v. Ed Sullivan Radio & T.V., Inc., 1 A.D.2d 609, 152 N.Y.S.2d 227 (1st Dept.1956); Avon Periodicals, Inc. v. Ziff-Davis Publishing Co., 282 App.Div. 200, 122 N.Y.S.2d 92 (1st Dept. 1953); Santa's Workshop, Inc. v. Sterling, 282 App.Div. 328, 329–330, 122 N.Y.S.2d 488 (3d Dept.1953). See also, Santa's Workshop, Inc. v. Sterling, 2 A.D.2d 262, 153 N.Y.S.2d 839 (3d Dept.1956) aff'd. 3 N.Y. 2d 757, 163 N.Y.S.2d 986, 143 N.E.2d 529 (1957); Artype, Inc. v. Zappulla, 228 F. 2d 695, 697 (2d Cir., 1956) (New York law applied).

20. Another way of expressing the same point might be to say that where unfair or wrongful expropriation is the gravamen of a second-comer's use of a mark, the "secondary meaning" which the first-comer must establish, is that the mark developed, to some substantial degree, favorable public familiarity or cachet, which it was the second-comer's intention to exploit.

21. It may be argued that this proposition, in combination with the traditionally broad discretion of courts of equity, would countenance articulation of "free-ride" unfair competition not only under the law of New York, but also under the "general indeterminate law" of unfair competition, as interpreted by this Cir-

cuit. This court, of course, need not and does not decide this question, but the following authorities are perhaps worth noting in this connection: Compare Dawn Donut Co., Inc. v. Hart's Food Stores, Inc., 267 F.2d 358 (2d Cir., 1959) with Ed Sullivan, supra, 1 A.D.2d 609, 152 N.Y.S.2d 227 (1st Dept.1956). This Circuit has firmly adhered to a strict "palming-off" test. Triumph Hosiery Mills, Inc. v. Triumph International Corp., 308 F.2d 196, 199 (2d Cir., 1962); Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614, 622 (2d Cir., 1962); American Chicle Co. v. Topps Chewing Gum, Inc., 208 F.2d 560 (2d Cir., 1953); DuPont Cellophane Co., Inc. v. Waxed Products Co., Inc., 85 F.2d 75, 81 (2d Cir., 1936), cert. den. 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936). Also, this Circuit may accord the element of wrongful intent a substantially lesser role than do the courts of New York. Triumph Hosiery Mills, supra, 308 F. 2d 196 (2d Cir., 1962), reversing, 191 F.Supp. 937 (S.D.N.Y.1961); Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 758 (2d Cir., 1960); Upjohn Co. v. Schwartz, 131 F.Supp. 649, 654 (S.D.N.Y.1954) modified, 246 F.2d 254 (2d Cir., 1957).

22. Cf., Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73

name or package design, then the legitimate interest of product competition may militate in favor of allowing another to copy and market a closely similar item.[23] And third, there is the question of the degree to which the products involved are in competition. This factor establishes the degree of likelihood that the trade name will be diluted or that trade will be diverted from the first-comer. Cf., Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir., 1961), cert. den. 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

As applied to the facts of the case at bar, considerations raised by each of these three factors tend to favor the granting of relief to these plaintiffs:

 (1) The word "Flexitized" cannot be said to have become, in the public mind, the one, generic, term of reference for a type of product. (2) The defendants are not charged with copying of product design, but with the use of a trade name. (3) The defendants used the word "Flexitized" in connection with closely competing products.

Other aspects of this case affirmatively suggest that injunctive relief is warranted here. By far the most significant of these is that prior to their unauthorized use of plaintiffs' trade name, defendants, as distributing agents, stood in a fiduciary relationship to the plaintiffs. Under the terms of this agency, defendants were entrusted with use of the word "Flexitized", in the corporate title of defendant National Flexitized and in connection with the marketing of stays made or sold by plaintiffs. The permission did not extend beyond the life and terms of the agency,[24] and the defendants must reasonably have realized this.[25] Defendants' continued use of the word "Flexitized" after the termination of the agency was flagrantly inconsistent with a fiduciary duty of fair dealing which does not, as regards expropriation of business assets of the principal, terminate with the agency.[26]

Another indicator of what may be termed "wrongful intent" on the part of the defendants is that their unauthorized use of the word "Flexitized" was the sequel to a breach on their

(1938). The application of this principle has given rise to differences among the courts. Compare Nissen Trampoline Co. v. American Trampoline Co., 193 F. Supp. 745 (S.D.Iowa 1961) with Nissen Trampoline Co. v. International Trampo-line Manufacturers, Inc., 190 F.Supp. 238 (E.D.N.Y.1960); compare American Chicle Co., supra, 208 F.2d 560, 562 (2d Cir., 1953) with Selchow v. Baker, 93 N.Y. 59, 65 (1883).

23. Cf., Hygienic, supra, 302 F.2d 614, 622 (2d Cir., 1962).

24. Special Questions 19–21 and the answers thereto.

25. Special Question 22 and its answer. In addition to their knowledge that plaintiffs had themselves coined the word "Flexitized" and had registered a trade-mark thereon, defendants were specifically apprised of plaintiffs position with regard to defendants use of that word in the letters of December 17, 1953 and July 16, 1957. These factors, together with the existence of an agency relationship here, make inapposite the proposition, applicable in other circumstances, that a plaintiff in a trade-mark infringement suit

may be barred by laches if, notwithstanding prompt notice to the defendant of his objections to their use of a mark, he has unduly delayed in bringing suit. Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir., 1961), cert. den. 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

26. Restatement of The Law of Agency 2d, § 396, p. 224 (1958). As defensive matter in this area, defendants have pointed to the undisputed evidence that, during the life of the agency, they spent a substantial sum in advertising and publicizing the word "Flexitized". This is, indeed, an element to be weighed in assaying the relative equities of plaintiffs and defendants here. But a crucial factor in this regard is that since, by the very terms of the agency itself, defendants' use of the word "Flexitized" was authorized only as long as they continued to sell plaintiffs' products exclusively, the very terms of the agency rebut an inference that the defendants could acquire a right to use the word "Flexitized" in connection with products not made or sold by them.

part of the very contract which had authorized their use of that word, under specified terms and limitations.

And, finally, it is clear that defendants' use of the word "Flexitized" could only have been motivated by a desire to capitalize on the cachet built up for that word during the life of the agency. That there are other words readily imaginable to serve equally well as trade names for the type of garment stays involved here is illustrated by the circumstance that the defendants have, on occasion, used the word "Flexway" in connection with the marketing of such items.[27]

Neither in this, nor in any other particular, have the defendants shown that an order enjoining their further unauthorized use of the word "Flexitized" would cause serious or undue hardship to their business.

The conclusion that plaintiffs are not entitled to recover money damages, and some of the reasons therefor have already been suggested. Of particular significance here is the considered reluctance, and the reasons for it, of New York courts to grant more than injunctive relief in analagous situations of unfair competition.

Moreover, as the jury found in response to Question 17, and indeed on the basis of what plaintiffs attempted to prove, the only evidence of damages on any claim in this case related to loss of profits by plaintiffs during the period from July 16, 1957 through December 31, 1958, which was presumably the date when the contract would have terminated "by its terms".[28] The jury, as we know from its answer to Question 10, has assessed and awarded $27,000 damages for breach of contract on the basis of the same evidence and for the same period.

Plaintiffs do not seriously question the obvious proposition that they are not entitled to a "double recovery". They do urge, however, that this court, either directly or with the aid of a special master, must hold further hearings to take evidence and assess damages for vaguely claimed "lost profits" from January 1, 1959 to the present. This court can find no New York case authorizing such a procedure in analagous circumstances. Moreover, as a practical matter, since plaintiffs have had another eastern United States agent or distributor of their products since September, 1957, any lost profits from January, 1958 to date seem unlikely or, at best, highly speculative.

To summarize, an order and judgment should be settled on notice to provide for judgment for plaintiffs on the breach of contract jury award of $27,000, with interest thereon at 6% to be computed from July 16, 1957 to and including January 18, 1963; for cancellation of the registered mark "Flexitized" and certification of such cancellation to the Commissioner of Patents; and for enjoining defendants and their affiliates and agents from using the word "Flexitized" as part of a corporate or firm title and in connection with their manufacturing, marketing and sales operations. With reference to the injunctive provisions of the proposed order and judgment, it is further directed that defendants be afforded a period of at least 60 days within which to divest themselves of their corporate name including the word "Flexitized" and all references to such word in their letterheads, billheads, advertising and promotional materials and the like.

---

27. Plaintiffs' argument that the word "Flexway" is sufficiently similar to the word "Flexitized" to work an infringement upon it, is without merit. Defendants rightly point out that the word "flex" is a word in the English language and that numerous trade-marks have been registered which employ "flex" as the initial or principle component.

28. "16. If the answer to #15 is yes, did this conduct of defendants cause injury or damage to the business of either plaintiff?" "Yes".
"17. If the answer to #16 is yes, state, for each plaintiff so injured, the money-amount of such injury or damage." "(See total in Question 10.)"